United States District Court
Southern District of New York
----------------------------------------------------------x
Alpha Capital Anstalt, a Lichtenstein company,
dba Alpha Capital,

                  Plaintiff,                      Case No.:   13-CV-05586-JGK

     -against-

New Generation Biofuels, Inc.; Lee S. Rosen
John E. Mack; Andrea Festuccia; David
Goebel; David A. Gillespie; Cary J. Claiborne;
and Dane Saglio, Inclusive,                   **<u>FIRST AMENDED COMPLAINT</u>**

                  Defendants.               JURY DEMAND
----------------------------------------------------------x

1

## TABLE OF CONTENTS

Page

I.    NATURE OF ACTION…………………………………………………………2

II.   PARTIES…………………………………………………………………....5

III.  JURISDICTION AND VENUE………………………………………… 5

IV.   COMMON ALLEGATIONS…………………………………………....6

    A.    Alpha's 2011 Investments……………………………………… 6

    B.    Defendants' Misrepresentations  - Overview………………………...9

    C.    Misrepresentation –
          Gross Overstatement of Value of Master License................................ 11

    D.    Misrepresentation or Omission
          Overstated Viability of Patents……………………………………15

    E.    Misrepresentations and Omissions –
          Rosen's NGBF Stock Holdings and Sales………………………… 23

    F.    Scienter: Common To All Defendants……………………………… 30

    G.    Scienter – Rosen……………………………………………………  32

    H.    Festuccia – Scienter…………………………………………….....  36

    I.    Mack – Scienter……………………………………………………  38

    J.    Claiborne – Scienter……………………………………………  40

    K.    Goebel – Scienter…………………………………………….....  42

    L.    Saglio – Scienter………………………………………………  43

FIRST CLAIM FOR RELIEF
    Securities Fraud; Violation of Section 10b against all Defendants………….. …. 44

SECOND CLAIM FOR RELIEF
    Common Law Fraud against all Defendants…………………………………50

THIRD CLAIM FOR RELIEF
    Negligent Misrepresentation against all Defendants…………………………… 56

FOURTH CLAIM FOR RELIEF
    Violation of Section 20(a) against all Defendants …………………………………61

*FIFTH CLAIM FOR RELIEF*

**Breach of Fiduciary Duties against all Defendants**…………………………………..62

*SIXTH CLAIM FOR RELIEF*

**Conspiracy Against All Defendants**……………………………………………… 63

*SEVENTH CLAIM FOR RELIEF*

**Aiding and Abetting Against All Defendants**………………………………...64

*EIGHTH CLAIM FOR RELIEF*

**Violation of Section 18 of the Securities Exchange Act (15 U.S.C. §78r)**……….. 65

**DEMAND FOR JURY TRIAL**………………………………………………..70

Plaintiff, Alpha Capital Anstalt, doing business as Alpha Capital, by and through its attorneys, for its Complaint, respectfully alleges:

## NATURE OF ACTION

1.      Plaintiff was defrauded by the Defendants into investing nearly $3 million into New Generation Biofuels, Inc. ("NGBF"), between May 2008 and October 2011.  Plaintiff is seeking by this First Amended Complaint to recover compensatory damages of $1,185,312.50 from the Defendants only on account of the last seven investments Alpha made in NGBF all of which were made in 2011; plus interest and punitive damages.  Plaintiff made the 2011 investments secured by a lien in all of NGBF's assets.  Plaintiff's willingness to make such a secured investment was based on a series of statements made by the Defendants to Plaintiff, including, without limitation, many misrepresentations made by the Defendants in NGBF's public statements filed with the Securities and Exchange Commission ("SEC") including, without limitation, that its Master License Agreement was worth more than $5 million, that its patent applications were pending and viable and, implicitly, that its officers, directors and control persons had made all public filings and disclosures relative to each such person's ownership and sales of NGBF stock in compliance with the federal securities laws.  In truth, the Master License Agreement was worthless, the patents had already been deemed to be deficient, not novel, and not representative of an inventive step, by major governmental patent offices that had reviewed and reported on them, and Defendant, Lee Rosen, the founder of NGBF, had been systematically selling his massive stockholdings in NGBF through an elaborate array of secret trusts to conceal his sales activity from investors he was concurrently soliciting to invest in NGBF, including Plaintiff, and to evade the disclosure requirements of the Securities and Exchange Commission in patent violation of the SEC's regulations.  As a direct result of such wrongful conduct,

2

Plaintiff's attempts to collect against its collateral proved fruitless and Plaintiff suffered a total loss on its 2011 investments.

## PARTIES

2.      Plaintiff, Alpha Capital Anstalt, is a company organized and existing under the laws of Lichtenstein.  Alpha Capital Anstalt does business from time to time as Alpha Capital, and is referred to herein, under either name, as "Alpha" or "Plaintiff."  Alpha's principal office is located in Vaduz, Lichtenstein.

3.      Plaintiff is informed and believes and based thereon alleges that Defendant, New Generation Biofuels Holdings, Inc., is a company organized in Florida whose principal offices were, at most relevant times, located in Maryland and in all other relevant times, located in Texas.  Plaintiff is informed and believes that NGBF is a company that no longer has any assets, operations or offices.

4.      Plaintiff is informed and believes and based thereon alleges that Defendant Lee S. Rosen ("Rosen"), at all relevant times, was and is a resident of Florida.  Plaintiff is informed and believes that Rosen, at all relevant times, controlled NGBF acting in the capacity as an untitled and undisclosed executive officer of NGBF.  Plaintiff is informed and believes that Rosen acted as Chairman of the Board of Directors of NGBF from its inception in 2006 through May 7, 2010. Although Rosen never took on an official executive title, and although Rosen ostensibly resigned his official title as Chairman of the Board of Directors with NGBF on May 7, 2010 pursuant to the terms of a lucrative separation agreement, Plaintiff is informed and believes that Rosen at all relevant times received substantial compensation in excess of amounts reasonable for the highest ranking officer of a company of the size of NGBF in cash, stock and stock options and stock sales and, at all relevant times, exercised *de facto* control over NGBF directly and indirectly

3

through nominees or strawmen, including the other Defendants named in this First Amended Complaint.

5.      Plaintiff is informed and believes and based thereon alleges that Defendant John E. Mack ("Mack"), at all relevant times, was and is a resident of Colorado.  Plaintiff is informed and believes that Mack served NGBF in the capacity as a Director from February 2007 through May 7, 2010; and at all relevant times thereafter exercised control over NGBF in his role as an undisclosed and untitled executive officer of NGBF, and at all such times after May 7, 2010, held the title Chairman of the Board of Directors while acting and receiving compensation in cash, stock and options consistent with his undisclosed role as an executive officer of NGBF.

6.      Plaintiff is informed and believes and based thereon alleges that Defendant Andrea Festuccia ("Festuccia"), at all relevant times, was and is a resident of Rome, Italy. Plaintiff is informed and believes that Festuccia, at all relevant times, served NGBF as its Chief Technology Officer.

7.      Plaintiff is informed and believes and based thereon alleges that Defendant David A. Gillespie ("Gillespie"), at all relevant times, was and is a resident of Texas. Plaintiff is informed and believes that Gillespie acted as NGBF's President and Chief Executive Officer during certain times commencing in October 2006 and ending in or around March 2009.

8.      Plaintiff is informed and believes and based thereon alleges that Defendant Cary J. Claiborne ("Claiborne"), at all relevant times, was and is a resident of Maryland.  Plaintiff is informed and believes that Claiborne was the Chief Financial Officer of NGBF from December 2007 until on or around March 2010.  Plaintiff is also informed and believes that Claiborne served as President and Chief Executive Officer of NGBF from March 2009 until on or around October 8, 2010.

4

9.      Plaintiff is informed and believes and based thereon alleges that Defendant David Goebel ("Goebel"), at all relevant times, was and is a resident of Texas.  Plaintiff is informed and believes that Goebel was the Vice President of Global Sourcing and Supply Chain for NGBF from September 2007 through July 2009, and, at all relevant times thereafter, was the Chief Operating Officer of NGBF.  Goebel also became the Interim Principal Executive Officer of NGBF on or around March 2011 and acted as such at all relevant times thereafter.

10.      Plaintiff is informed and believes and based thereon alleges that Defendant Dane Saglio ("Saglio"), at all relevant times, was and is a resident of Maryland.  Plaintiff is informed and believes that Saglio was the Chief Financial Officer of NGBF at all relevant times after March 2010.

11.      Plaintiff is informed and believes and based thereon alleges that other persons were representatives, agents, employees, contractors, directors or affiliates of NGBF, and in such capacity conspired with the named Defendants or otherwise participated in the fraudulent conduct alleged herein, and/or for some other reason are culpable and liable for Plaintiff's losses alleged herein.  Plaintiff reserves the right to amend this Complaint to identify such persons and their conduct when such facts become known to Plaintiff.

## JURISDICTION AND VENUE

12.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that the action is between a company with its principal office in a foreign country and defendants who are citizens of foreign states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.  Separately, this Court has jurisdiction over this action under 28 U.S.C. § 1331 in that the action arises under the laws of the United States – the federal securities laws.  This Court has subject matter jurisdiction over the securities laws claims stated

herein because NGBF is a company that was organized in the State of Florida and located in the United States (Texas or Maryland), at all relevant times, and incurred irrevocable liability to issue and deliver the securities sold to Plaintiff, as alleged in more detail below, within the borders of the United States.

13.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a), in that it is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of the property which is the subject of the action is situated. In addition, many of the agreements alleged below contain venue provisions calling for the resolution of disputes arising from such agreements in New York.

## COMMON ALLEGATIONS

### A. Alpha's 2011 Investments.

14.     Alpha's seven investments upon which relief is sought were made on or around January 2011 ($50,000); February 1, 2011 ($785,312.50); April 15, 2011 ($100,000); May 18, 2011 ($50,000); July 5, 2011 ($125,000); August 10, 2011 ($50,000) and October 12, 2011 ($25,000); totaling $1,185,312.50.

15.     The first two investments, totaling $835,312.50, were documented in the following writings dated February 1, 2011: Subscription Agreement, a true and correct copy of which is attached at **Exhibit 1**; Secured Convertible Promissory Note, a true and correct copy of which is attached hereto at **Exhibit 2**; Security Agreement, a true and correct copy of which is attached hereto at **Exhibit 3**; Class A and Class B Common Stock Purchase Warrants, a true and correct copy of which is attached hereto at **Exhibits 4 and 5**, respectively; and Escrow Agreement, a true and correct copy of which is attached hereto at **Exhibit 6**.

16.     On or around April 15, 2011, Alpha and NGBF entered into an Allonge of the Secured Convertible Promissory Note Issued February 1, 2011, and, based thereon, Alpha invested an additional $100,000 into NGBF.  A true and correct copy of that Allonge is attached hereto at **Exhibit 7**.

17.     On or around May 17, 2011, Alpha and NGBF entered into an Allonge of the Secured Convertible Promissory Note Issued February 1, 2011, and, based thereon, Alpha invested an additional $50,000 into NGBF.  A true and correct copy of that Allonge is attached hereto at **Exhibit 8**.

18.     On June 7, 2011, Plaintiff and NGBF entered into a second set of 2011 agreements.  Those documents include a Secured Convertible Promissory Note, a true and correct copy of which is attached hereto at **Exhibit 9**; a Class A and Class B Common Stock Purchase Warrants, a true and correct copy of which is attached hereto at **Exhibits 10 and 11**, respectively; an Escrow Agreement, a true and correct copy of which is attached hereto at **Exhibit 12**; and a First Amendment and Consent Agreement, a true and correct copy of which is attached hereto at **Exhibit 13**.  Pursuant to the terms of such documents, Alpha invested $125,000 on or around July 5, 2011.  In addition, Alpha invested $50,000 in NGBF on or around August 10, 2011 pursuant to a Second Amendment Agreement dated August 4, 2011; and an additional $25,000 on or around October 12, 2011 pursuant to the terms of a Third Amendment Agreement dated October 6, 2011, true and correct copies of which are attached hereto at **Exhibits 14 and 15,** respectively.

19.     With respect to all such 2011 investments totaling $1,185,312.50, Alpha was never paid any portion of such Convertible Promissory Notes; and never exercised the Class A and Class B Warrants.  Alpha's collection efforts against the collateral proved to be futile as the

Master License and intellectual property rights that Defendants had for years represented to have values in excess of $5 million, proved to be worthless; and the patents which the Defendants had represented to have substantial value, in truth had been deemed materially deficient by every major government patent office to have reviewed them, including the United States Patent Office.  The Defendants, and each of them, had access to patent reports and financial information relative to the absence of any material actual or prospective transactions of NGBF, such that their refusal to see the obvious truth, that the Master License Agreement was valueless and that the patent applications were doomed to failure, gives rise to an inference of malicious intent, or at least reckless disregard for the truth.

20.    As a direct and proximate result of such misconduct, Alpha was misled into investing in NGBF and, consequently, suffered a total and complete loss of such seven investments exceeding $1 million.  Alpha relied on the statements of NGBF's filings with the SEC; NGBF's Business Plan, Technology Briefing; Financial Plan, Subscription Agreement representations and warranties; presentations by its officers; and emails and verbal statements detailed below, in making such investments.  Alpha's reliance on the existence of patentable technologies and NGBF's public filings claiming the value of the Master License Agreement to have a value of over $5 million is particularly evident in the fact that in making Alpha's 2011 investments, Alpha insisted on and received a security interest in substantially all of NGBF's assets, including, without limitation, its contract rights, license rights and intellectual property rights.  Had Alpha known the true facts that (1) the Master License had no value whatsoever; (2) the patent applications for the technology represented by the Defendants to be the most significant assets of NGBF were not viable and, indeed, had already been the subject of devastating responses received by NGBF and its counsel from various government authorities;

and (3) Rosen, who directly sold the investments to Alpha, had created a secret undisclosed web of trusts through which he was in the process of dumping his massive NGBF stock holdings into the public market without making the disclosures and public filings required by the SEC and in violation of federal law, Alpha would not have made any one of its 2011 investments and, therefore, would not have suffered any of the losses suffered on all of such investments.

21.    The convertible debt instruments and warrants issued by NGBF to Alpha on account of these seven investments constitute securities under the securities laws.

**B.  Defendants' Misrepresentations  - Overview:**

22.    The misrepresentations and omissions by the Defendants to Alpha to induce Alpha to invest in NGBF in 2011 can be categorized into three distinct sets of misrepresentations and omissions.

23.    The first set of misrepresentations and omissions involved Defendants' overstating the value of the Master License in numerous SEC filings, as well as in written and verbal presentations, as detailed below.  The represented value of such intellectual property rights ranged from over $5 million to over $8 million.  The true value of such intellectual property was zero.  Thus, each time that Defendants published annual Form 10K's for NGBF, by filing such statements with the SEC, the Defendants vastly overstated and misrepresented the true value of such intellectual property rights, the primary or only asset of NGBF.  Plaintiff only learned the true value of such intellectual property after making its investments in NGBF, including its 2011 investments.  Plaintiff would not have made any of its investments had it known the true value of the Master License was zero, rather than between $5 million and $8 million, as reported in NGBF's filings.

24.     The second set of misrepresentations and omissions was Defendants concealment and failure to disclose to Alpha devastatingly negative responses NGBF and its counsel had received from foreign and domestic governmental patent offices to NGBF's foreign and domestic patent applications, even while disclosing and discussing in positive terms the pending status of such patent applications.  The omission of such disclosures in NGBF's filings with the SEC; as well as in written and verbal presentations and private conversations between Alpha's representatives and NGBF's representatives, rendered Defendants' statements discussing its patent applications in positive and optimistic terms misleading as to Alpha.  Alpha understood, from the Defendants' descriptions of NGBF patent rights, that these patent applications had substantial value and that the technology represented by the Defendants to be the principal asset of NGBF created a valuable, unique and protectable asset of NGBF.  In truth, such patents were not viable from the outset and Defendants, and each of them, knew that at the time they made the misrepresentations indicating the viability of such patents in NGBF's annual Form 10-K's and in other documents and correspondence, detailed below. Plaintiff was unaware of the devastating responses by the governmental patent offices received by NGBF or the absence of viability of NGBF's patent applications when it made its 2011 investments.  Had Alpha known such facts, it would not have made such investments.

25.     The third set of misrepresentations which came to light only after Alpha's 2011 investments involves Rosen's failure to disclose his scheme to conceal his stock ownership and sales of NGBF stock into the public market through a labyrinth of trusts in which he disclaimed any interest. Rosen was sued by the SEC for fraudulent concealment of his stock holdings and sales in NGBF stock and quickly stipulated to a judgment against himself ordering him to disgorge $716,484 plus civil penalties of $195,000, and enjoining him from further violations of

the federal securities laws, including the anti-fraud provisions, based on the very same concealment tactics that he used to defraud Alpha.   A true and correct copy of the SEC's complaint filed against Rosen is attached hereto at **Exhibit 16**.   A true and correct copy of the Judgment entered against Rosen in that case is attached hereto at **Exhibit 17**.   The allegations at **Exhibit 16** are incorporated herein as if set forth in full.   Plaintiff was unaware of Rosen's true NGBF stock holdings and stock sales until after Alpha had made all of its 2011 investments. Had Alpha known such facts, it would not have made such investments.

### C. <u>Misrepresentation – Gross Overstatement of Value of Master License</u>.

26.     NGBF was a start-up biofuels company, formed in 2006.   NGBF's assets, almost entirely, rested on the value of a single master license agreement, which NGBF represented to have a value of $8,061,300 through December 31, 2007.   A true and correct copy of excerpts of NGBF's December 31, 2007 Form 10-K is attached hereto at **Exhibit 18**; see p. 25.   Defendants Gillespie, Claiborne, Rosen and Mack, among others, signed and approved that 2007 Form 10-K and caused the false and misleading misstatements and omissions contained in such Form 10-K to be disseminated to investors, including Alpha.   See **Exhibit 18**, p. 63.

27.     NGBF's Form 10-K's for the year ended December 31, 2007; 2008; 2009 and 2010 vastly overstated the value of NGBF's Master License.   Specifically, NGBF's Form 10-Ks filed with the SEC reported that the value of the Master License owned by NGBF was $8,061,350; $6,267,460; $5,650,988 and $5,039,545, at the year end dates of December 31, 2007; December 31, 2008; December 31, 2009 and December 31, 2010, respectively.   Each year, the Form 10-K filed with the SEC by NGBF represented that NGBF valued the Master License in compliance with SFAS 144. NGBF's Form 10-Ks explained that, in accordance with SFAS 144, NGBF reviewed the value of the Master License on a periodic basis for impairment.

NGBF's Form 10-Ks represent that the Master License value was measured by the future undiscounted net cash flows expected to be generated by the asset. NGBF's 10-K filings explain that if the Master License value on the books of NGBF were considered to be impaired, after such review, the impairment to be recognized would be measured by the amount by which the carrying amount of the asset exceeds the fair value of the assets. NGBF's Form 10-Ks also represented that, in accordance with SFAS 142, NGBF had capitalized its Master License and has estimated its useful life to be 13 years. Excerpts of NGBF's December 31, 2007 Form 10-K is attached hereto at **Exhibit 18**; see pp. 9, 10, 16, 17, 18, 27, 28, 31, 32, 35, 38 and 39. See also a true and correct copy of NGBF's December 31, 2008 Form 10-K attached hereto at **Exhibit 19**, pages 10, 11, 15, 25. Defendants Claiborne, Rosen and Mack, among others, signed and approved that 2008 Form 10-K and caused the false and misleading misstatements and omissions contained in such Form 10-K to be disseminated to investors, including Alpha. See **Exhibit 19**, p. 52. See also a true and correct copy of NGBF's December 31, 2009 Form 10-K attached hereto at **Exhibit 20**, pages F-4, F-7, F-8, F-10, F-11, F-14 and F-17. Defendants Claiborne, Rosen and Mack, among others, signed and approved that 2009 Form 10-K and caused the false and misleading misstatements and omissions contained in such Form 10-K to be disseminated to investors, including Alpha. See **Exhibit 20**, p. 35. See also a true and correct copy of NGBF's December 31, 2010 Form 10-K attached hereto at **Exhibit 21**, pages 24, 26, F-3 and F-9. Defendants Goebel, Saglio and Mack, among others, signed and approved that 2010 Form 10-K and caused the false and misleading misstatements and omissions contained in such Form 10-K to be disseminated to investors, including Alpha  See **Exhibit 21**, p. 52.

28.     In each year from 2007 through 2010, with the sole exception being 2008, NGBF's Form 10K stated that, after the testing for impairment was concluded, there had been no

impairment of the stated value of the Master License.  The value of the Master License was amortized by NGBF over 13 years starting in 2008, which accounts, with the exception of 2008, for the declining valuation of the Master License agreement in the successive Form 10-K reports filed by NGBF.

29.    Apart from amortization, in 2008, NGBF took a one-time write down of the value of the Master License based on the following representations:

> Based upon our analysis, the probability weighted sum of the discounted cash flows attributable to the Master License Agreement is less than its carrying value. Therefore, for the year ended December 31, 2008, the Company recorded a write-down of the Master License Agreement in the amount of $1,600,369.

See **Exhibit 19,** pp. 28, 31, 32, 34, 37.

30.    In truth, there was never any rational basis to project any future profit or cash flow from the Master License Agreement.  The technology licensed did not give NGBF any material protectable advantage in the industry and did not otherwise provide any basis to project a future revenue stream, much less a profitable revenue stream.  NGBF's 10K filings for 2007-2010 falsely misrepresented and overstated the value for the Master License rights of between $5 million and $8 million and falsely claimed to reflect periodic tests of the accuracy of such valuation based on future cash flows.  Such Master License, in truth, had no value, and no true market value test of the statements of value contained in such Form 10K filings was actually or competently conducted.  Given the critical importance of such valuations in the context of NGBF's financial statements, such false and misleading statements were either made with actual intent to deceive investors or were made recklessly by the Defendants who signed and caused to be filed with the SEC such Form 10-Ks.

31.    Ari Rabinowitz ("Rabinowitz"), acting as an officer of LH Financial Services Corp., a services company acting for Alpha with respect to the transactions alleged in this

Complaint, first met Rosen in 2008.   At that meeting, Rosen solicited Alpha, through Rabinowitz, and persuaded Alpha, through Rabinowitz, to have Plaintiff invest in NGBF.  Rosen told Rabinowitz, among other things, that NGBF's proprietary technologies were extremely valuable, worth at least the $8.1 million valuation stated in NGBF's financial statements; and that such valuable proprietary technologies were the subject of pending valuable and viable patent applications with all major market countries, including the United States Patent and Trademark Office ("USPTO") and, under the PCT, with respect to over 100 participating countries.  Rosen told Rabinowitz that such valuable intellectual property rights provided NGBF with a valuable, substantial and unique competitive advantage in the processing of biofuels. Such purported value, Rosen advised Rabinowitz, was reflected in a multi-million dollar master license agreement with the inventor, Petrucci.  In reliance on such representations, Alpha made a series of investments in NGBF in 2008, 2009 and 2010.  Although these transactions resulted in losses to Alpha, Alpha is not seeking relief for such investments in this First Amended Complaint.

32.      In the late summer of 2010, Rabinowitz was asked by a mutual acquaintance to meet again with Rosen.  Rabinowitz agreed to do so.  Rosen blamed prior management for the fact that the company had not yet taken off.   Rosen repeated his previous misstatements regarding the strength and value of NGBF's intellectual property, patent applications and valuable master license agreement, and added that NGBF had recruited a new Chief Financial Officer, Dane Saglio, and new Chief Operating Officer, David Goebel, to ensure the success of NGBF.  Rosen asserted that Rosen would raise a little more capital for NGBF so that NGBF would have the funds necessary to capitalize on its revolutionary proprietary technology.  Rosen added that the patents alone were worth more than the market cap of NGBF at that time.  Rosen

explained that although the filings of NGBF indicated that he had resigned from the Company, Rosen was still running the Company, but due to his resignation from his official roles with NGBF, he would now be in a better position than ever to raise funds for the Company to ensure its success.  Mr. Rabinowitz followed up that discussion by conducting due diligence on behalf of Alpha.  He made numerous calls with new NGBF management, Saglio and Goebel, and reviewed the SEC filings made by NGBF.  Notably, Rosen, Saglio, Goebel and the SEC filings by NGBF omitted to advise Alpha of the material facts that NGBF's Master License was valueless, that NGBF's patents were doomed to fail based on reasons already stated in two devastating ISA Reports, what the stated grounds for such rejections were, or that Rosen had been secretly selling his NGBF's stock without disclosure in violation of the federal securities laws.  Rosen also failed to disclose to Alpha that Rosen was not seeking investors to ensure the success of NGBF, as he claimed, but as a means to provide for his personal profitable exit from the company by liquidating his shares held in undisclosed trusts into the public market supported by the announcement of Alpha's investment.

### D. Misrepresentation or Omission – Overstated Viability of Patents.

33. NGBF's 10-K filings included extensive discussions about the importance to NGBF that its patent applications be successful and described the risks that the governmental patent offices reviewing such patents might not approve such patent applications.

34. At page 7 of NGBF's 2007 Form 10K (**Exhibit 18**), for example, NGBF highlighted and discussed the patent applications filed with the Receiving Office and USPTO.

> We rely on our contractual exclusivity in North America, Central America and the Caribbean under our license and on a combination of know-how and trade secret rights and potential patent rights to establish and protect our rights in our technology. In April 2006, we filed a U.S. provisional patent application on behalf of the inventor and directed to the technology covered by our license. In April 2007, we filed a U.S. nonprovisional

> patent application and foreign patent applications for the technology. Until
> patent protection is granted, we must rely on trade secret protection, which
> requires reasonable steps to preserve secrecy. Our success will depend, in
> large part, on our technology's commercial viability and on the strength of
> our intellectual property rights. Much of the technology presently consists
> only of trade secret rights, which are difficult to protect. If others gain
> access to the trade secrets relating to our technology, including through
> analysis or "reverse engineering" of the additives or biofuel made with the
> technology, they may able to develop substantially equivalent
> technology….

Substantially identical language was included in the NGBF's Form 10K for 2008 (**Exhibit 19**, p.

9); 2009 (**Exhibit 20**, p. 10) ("In April 2006, we filed a U.S. provisional patent application on

behalf of the inventor and directed to the technology covered by our license. In April 2007, we

filed a patent application under the Patent Cooperation Treaty which claimed the benefit of the

U.S. provisional application and in September 2008 we filed national applications in the United

States and certain foreign countries").

35. NGBF's Form 10K for 2010 (**Exhibit 21**) again discusses NGBF's patents,

without disclosing the patent rejections NGBF had received before such annual report was filed

with the SEC:

> We are a clean energy company deploying novel technologies to produce cleaner,
> renewable biofuels. We have rights to a portfolio of patented and patent pending
> technology to manufacture alternative biofuels from plant oils, animal fats and
> related oils, which we market as a new class of biofuel for power generation,
> commercial and industrial heating, and related uses.

**Exhibit 21**, p. 1.

> Our technology centers on the use of precise mixing approaches to blend
> renewable oils with water to create renewable biofuels. These precise mixing
> approaches, emulsions and solutions, represent our patent pending technologies.

**Exhibit 21**, p. 6.

> Also, in 2010, we filed a provisional patent for pyrolysis oil as a feedstock and a
> provisional patent for a glycerin solution. In February 2011, we filed another
> provisional patent for a solution using pyrolysis oils.

16

**Exhibit 21**, p. 8.

In April 2006, we filed a provisional U.S. patent application on behalf of the inventor for the emulsion technology covered by our license. In April 2007, we filed a patent application under the Patent Cooperation Treaty which claimed the benefit of the provisional U.S. application and in September 2008, we filed national applications in the U.S. and certain foreign countries. Between 2006 and 2009, our R&D efforts significantly improved the initial emulsion formulation which resulted in the filing of amendments to the original provisional patent for two new renewable biofuels. In addition to being renewable, these biofuels significantly lower NOx, Sox and carbon emissions in relation to traditional petroleum diesel and can be produced from a wide variety of non-food feedstocks. We have continued to develop new feedstocks for the emulsion technology including a 2010 filing of a provisional patent for pyrolysis oil as a feedstock. Also in 2010 we filed a provisional patent for a glycerin solution. In February 2011 we filed another provisional patent for a solution using pyrolysis oils. We believe the patents we have filed for the glycerin and pyrolysis oil based biofuels, that are solutions instead of emulsions, are available to us for global production, sales and licensing and are not covered by our emulsion technology license agreement.

Until patent protection is granted, we must rely on trade secret protection, which requires reasonable steps to preserve
secrecy.

**Exhibit 21**, p. 11.

We are a clean energy company deploying novel technologies to produce cleaner, renewable biofuels. We have rights to a portfolio of patented and patent pending technology to manufacture alternative biofuels from plant oils, animal fats and related oils, which we market as a new class of biofuel for power generation, commercial and industrial heating, and related uses. We began generating revenues in 2008.

**Exhibit 21**, p. 24.

The Company has the rights to a portfolio of patented and patent pending technology to manufacture alternative biofuels from plant oils and animal fats that it markets as a new class of biofuel for power generation, commercial and industrial heating and related applications. The Company believes that its proprietary biofuel can provide a lower cost, renewable alternative energy source with significantly lower emissions than traditional fuels. Through our wholly owned subsidiary, New Generation Biofuels, Inc., a Delaware corporation, the Company holds an exclusive license for North America, Central America and the Caribbean to commercialize proprietary emulsion technology, (the "Licensed

> Technology"), as fully described in Note 3. The Company has two patent applications pending for solution based biofuel utilizing low alternative use feedstocks sourced from by-products of other technologies. The Licensed Technology coupled with the new filed patents constitute the Company's technology, (the "Technology") which centers on the use of precise mixing approaches to blend oils from renewable sources with water to create renewable biofuels.

**Exhibit 21,** p. F-7.

36.     Patent applications, which the Defendants knew were doomed to fail, were nonetheless filed for 37 claims based on the Petrucci additive with the USPTO and with international Receiving Offices[1] on April 27, 2006 and April 10, 2007, respectively.  These patent applications shall be referred to herein as the "Petrucci Patent Applications – Set 1".

37.     On or around May 24, 2010, NGBF filed a second set of 21 Claims in its provisional patent application  "Festuccia Patent Applications – Set 1" with the USPTO with respect to Glycerine Based Biofuel Composition and Method purportedly invented by Defendant, Andrea Festuccia.  The Festuccia Patent Applications advanced from provisional applications to permanent applications with the USPTO on or around May 24, 2011, when these applications were also filed with the PCT's European Patent Office.

38.     On or around July 6, 2010, NGBF filed a third set of 20 Claims in its provisional patent application "Festuccia Patent Applications – Set 2" with the USPTO with respect to Pyrolysis Oil based biofuel composition & method of production purportedly invented by Defendant, Andrea Festuccia.   The Festuccia Patent Applications advanced from provisional

---

[1]  Pursuant to the PCT, applicants may file an international application with a "Receiving Office" (i.e. one of the participating national or regional patent offices). *See* PCT, Art. 10; *see also* 4A Chisum on Patents, § 14.02[4][a][i]. The Receiving Office then forwards the application to the International Search Authority (the "ISA") and the World Intellectual Property Organization ("WIPO"). *See* PCT, Art. 12; *see also* 37 C.F.R. § 1.415(a) (identifying WIPO as the "International Bureau" under the PCT). The ISA is comprised of particular national and regional patent offices that are authorized to conduct a preliminary examination of the application. *See* PCT, Art. 16.

applications to permanent applications with the USPTO on or around July 6, 2011, when these applications were also filed with the PCT's European Patent Office (claims 1-23).

39.     The foregoing patent applications were discussed generally in the Form 10K filings filed by NGBF with the SEC, as detailed above.

40.     What Defendants concealed and did not disclose in such 10K filings with the SEC was that the same patent applications filed under the Patent Cooperation Treaty ("PCT")[2] already had been found to be materially deficient by European patent officials, including that the documents submitted to support the patent applications had failed to establish that the subject of the patent application was "novel"; or that it involved an "inventive step".  Unbeknownst to Alpha, the October 23, 2007 ISA Report sent to NGBF's counsel on or around that date, expressly explained that the Petrucci Patent Applications – Set 1 claims were deficient in that, among other things: (1) the patent claims are "not considered to be of particular relevance"; (2) "cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone"; and (3) "the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art."   A true and correct coy of that ISA

---

[2]   The **Patent Cooperation Treaty** (**PCT**) is an international patent law treaty that provides a unified procedure for filing patent applications for participating countries in designated Receiving Offices.  Presently, there are approximately 147 participating countries included within the PCT, including China, United Kingdom, France, Germany, Italy, Israel, Iran, Australia and Spain.  While there is no international patent, the PCT provides a uniform procedure to obtain patents in a wide range of countries.  Upon receipt by a Receiving Office of a patent application under the PCT, the International Searching Authority (ISA) searches the international PCT database and provides a written opinion of patentability.  Thereafter, the relevant national or regional authorities administer the patent applications transmitted under the PCT.

Report is attached hereto at **Exhibit 22**.  The Defendants, and each of them, knew about such ISA Report and had access to it at all relevant times.

       41.     Indeed, every major governmental patent office to have analyzed any of the patent applications indicated the same deficiencies.  See European Search Report dated February 8, 2010; Australian Patent Office Search Report dated May 11, 2010; International Search Reports dated July 20, 2011; September 13, 2011 and September 29, 2011 and European Patent Office International Search Report dated October 8, 2011, true and correct copies of which are attached hereto at **Exhibits 22-28**, respectively.  These devastating deficiencies were not curable by NGBF and, indeed, were never cured.  These deficiencies would prove to be the basis for the rejection of all of NGBF's patent applications.  Attached hereto at **Exhibit 29** is a true and correct copy of the US Patent and Trademark Office report dated December 27, 2011, rejecting the same patent applications for essentially the same reasons cited by the ISA reports. The Defendants, and each of them, knew about such ISA Reports and European Patent Office reports and had access to them at all relevant times after their issuance. The Defendants were required by the federal securities laws to make all disclosures that were necessary to make NGBF's public disclosures not misleading.  They failed to do so.

       42.     On March 27, 2011, NGBF, through Defendant, Saglio, sent via email to Rabinowitz, for Alpha, NGBF's Business Plan, also referred to as its Executive Summary, a true and correct copy of which is attached hereto at **Exhibit 30**.  Defendants' multi-colored plan published to investors, including Alpha, represents:

> Our technology centers on the use of precise mixing approaches to blend oils from renewable sources with water to create renewable biofuels. These precise mixing approaches, emulsions and solutions, represent our patent pending technologies.

**Exhibit 30**, p. 5

> In 2010 NGBF filed a provisional patent submission for a pyrolysis-based emulsion biofuel (Andrea Festuccia inventor). The patent process is proceeding forward with **no significant issues to date** nor do we anticipate any. In 2011, NGBF filed a second provisional patent application for a new pyrolysis oil based biofuel that is solution and not an emulsion. The patent process for this technology is just beginning but we do not anticipate any significant issues.

**Exhibit 30**, p. 8.  Emphasis added.

43.    On May 3, 2011, Defendant Saglio sent an email to Rabinowitz, acting for Alpha, soliciting further investment from Alpha, and attaching a finance plan that disclosed 3 new patent applications that had been filed by NGBF, implying that they were material and valid.  A true and correct copy of that attachment is attached hereto at **Exhibit 31**.  Shortly thereafter, NGBF published a "Technology Briefing" reiterating the strength of its patent pending technologies.

44.    Even the last 10-Q filed by NGBF on September 13, 2011 and last 8-K filed on October 17, 2011 made no mention of any patent rejections.

45.    On October 19, 2011, NGBF's Chief Executive Officer, David Goebel, sent an email to Geoff Soares, a representative of Alpha, expressly discussing, in considerable detail, each of NGBF's pending patent applications, but omitting, again, any disclosure of the fact that the first 37 and last 23 patent claims all had been uniformly rejected, the basis for such rejections, the diminished likelihood of the USPTO patent claims, or the devastation that the likely rejection of all of NGBF's patent claims would have on the valuations provided in NGBF's SEC filings with respect to its intellectual property rights and master license agreement.

46.    On October 26, 2011, Andrea Festuccia, NGBF's Chief Technology Officer, sent an email to Geoff Soares and Mr. Goebel, discussing explicitly NGBF's patent applications, again omitting completely from the discussion, the patent application rejections that NGBF had received, and their direct and indirect devastating consequences on NGBF and all of its assets.

47.     Based on all of the foregoing, Plaintiff is informed and believes that the Defendants who signed and approved each of the foregoing NGBF Form 10K reports and Business Plan, and each of them, knew that the patent applications were doomed to fail, at all relevant times, but submitted and prosecuted such patent applications and discussed them in their SEC filings in positive and optimistic terms for the sole and intended purpose of deceiving investors, including Alpha, into believing that such patent applications were viable with the intention of inducing them to invest in NGBF directly, or indirectly through the purchase of its stock in the public market.  At the very latest, by the time that the patent application deficiencies were noted in an ISA Report and European Patent Office report, Defendants, and each of them, knew or were reckless in not knowing that such deficiencies existed and could not be cured by NGBF.  At the moment that they became aware of such reports, or at the moment that they became aware that NGBF's patent applications were deficient, whichever came first, Defendants had a duty to disclose such facts to their investors and prospective investors, especially given that such patents were expressly discussed in NGBF's Form 10Ks and Business Plan and were material to a reasonable investor, including Alpha, in considering whether or not to invest in a company wholly dependent on the value of its technology, NGBF.  At the very least, a reasonable investor, including Alpha, would consider these facts pertaining to the rejection of patent applications material because the rejection of such patent applications would necessarily reduce or eliminate entirely the stated value of the Master License agreement, the primary asset of NGBF reflected in NGBF's Form 10K filings.  NGBF and Defendants never informed Alpha of such facts or the substantial reduction in the valuation of NGBF's Master License rights that would be warranted as a result of such ISA Reports and European Patent Office reports; and instead continued to falsely report to investors that the Master License agreement was worth

many millions of dollars and to discuss the patent applications in their Form 10-Ks and Business Plan as if they remained viable and had not been rejected for incurable reasons. Because NGBF's Form 10-K filings had expressly spoken on the issue of such patents, the Defendants, and each of them, were required to make disclosures regarding the patent office deficiency reports and the ramifications of such reports with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by their initial misrepresentations – i.e. at a minimum by filing such disclosures with the SEC where investors who had accessed and read the Form 10-Ks and Business Plan would likely look for correcting or clarifying information. The Defendants, and each of them, made no such disclosures or filings and otherwise concealed such facts from Alpha.

     **E.**   <u>**Misrepresentations and Omissions – Rosen's NGBF Stock Holdings and Sales.**</u>

48.     Plaintiff is informed and believes that from no later than October 2006 until May 2010, Rosen fraudulently evaded the reporting requirements concerning his beneficial ownership and pecuniary interest in NGBF shares held in five separate undisclosed trusts.

49.     Rosen directly or indirectly profited from the sale of NGBF shares, but failed to properly disclose the sales to investors as is required by statutory insiders, like Rosen, a Director and owner of more than 10% of NGBF's outstanding shares. Rosen received at least $666,000 in direct payments from sales of NGBF stock held in three of the trusts from a trustee's individual brokerage accounts.

50.     Rosen also indirectly benefited from using NGBF shares held in two trusts, valued at approximately $4.4 million, as partial payment for the purchase of a yacht. Rosen failed to disclose these transactions and his true holdings in NGBF securities in various SEC filings.

51.     Further, Rosen made false and misleading statements and omissions in SEC filings regarding his true beneficial ownership of NGBF shares.  Rosen's fraudulent statements included disclaiming beneficial ownership in NGBF shares held in three trusts.  Rosen also failed to disclose his beneficial ownership of NGBF shares in another trust.  Rosen's omissions included failure to disclose his receipt of profits from the sale and disposition of NGBF shares held in the trusts and failure to disclose his true beneficial ownership.

52.     Through this conduct, Rosen violated Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §77q(a); and Sections 10(b), 13(d), and 16(a) and Rules 10b-5, 13d-1, 13d-2, 16a-3, and 16a-8 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), 15 U.S.C. § 78p(a), 17 C.F.R. §240.10b-5, 17 C.F.R. §240.13d-1, 17 C.F.R. §240.13d-2, 17 C.F.R. §240.16a-3 and 17 C.F.R. §240.16a-8.

53.     Rosen is an extremely sophisticated securities investor, having held in the past Series 3, 7, 55, and 63 securities licenses.

54.     As such, he concocted a web of trusts through which to conceal his NGBF stock holdings and sales from NGBF investors and prospective investors, including Alpha, to whom he solicited investments in NGBF.  Rosen's trusts included the Lee Rosen 2006 Irrevocable Trust ("Rosen Irrevocable Trust"), Oasis Trust, Pacific Trust, River Trust and Aspen Trust (collectively, the "Rosen Trusts").  All of the Rosen Trusts were established and maintained in Florida, where Rosen resides.  The Rosen Trusts were established in March 2006 and were funded with NGBF shares as Rosen was founding NGBF.  The table below details the Rosen Trusts' beneficiaries and Rosen and the Rosen Trusts' NGBF stock holdings as of October 2006:

| Rosen and Rosen Trusts | Named Beneficiaries | New Generation Shares and Options Rosen Held | % of New Generation Shares | Beneficial Ownership Rosen Disclosed |
|---|---|---|---|---|
|  |  |  |  |  |

| Rosen | N/A | 1,500,000 | 8.77% | 1,500,000 stock options |
|---|---|---|---|---|
| Rosen Irrevocable Trust | Rosen's wife (2/2008 to present); Rosen (3/2006 – 2/2008) | 2,090,000 | 12.23% | 2,090,000 |
| Oasis Trust | Rosen | 488,236 | 2.86% | 0 |
| Pacific Trust | Rosen's wife | 678,750 | 3.97% | 0 |
| River Trust | Rosen | 1,000,000 | 5.85% | 0 |
| Aspen Trust | Rosen's son | 1,000,000 | 5.85% | 0 |
| **Total** | | **6,756,986** | **39.53%** | **3,590,000** |

55.     In October 2006, Rosen filed, as an individual, a Form 3 and a Schedule 13D with the SEC providing information about his beneficial ownership of NGBF shares.  Rosen's filings stated he was an officer and director of NGBF and, based on his beneficial ownership of 2,090,000 NGBF shares, and options to purchase 1,500,000 NGBF shares, he surpassed the ownership reporting thresholds of Section 16(a) of the Exchange Act.

56.     Rosen's individual Form 3 and Schedule 13D stated he directly held options to purchase 1,500,000 NGBF shares and indirectly owned 2,090,000 NGBF shares held in the Rosen Irrevocable Trust.

57.     However, Rosen also falsely disclaimed beneficial ownership of 2,678,750 NGBF shares held in the River Trust (1,000,000), Aspen Trust (1,000,000) and Pacific Trust (678,750). Further, Rosen utterly failed to disclose his beneficial ownership of 488,236 NGBF shares held in the Oasis Trust.

58.     In addition, as NGBF's Chairman of the Board, Rosen signed Forms 10-KSB and 10-K filed with the SEC on April 2, 2007 and March 31, 2008 which also stated that Rosen had no beneficial ownership of 2,678,750 NGBF shares held by trusts, including the River Trust and

the Aspen Trust.  Rosen further failed to reflect subsequent changes in his beneficial ownership of NGBF shares in the March 31, 2008 Form 10-K he signed for NGBF (**Exhibit 18**).

59.     At the same time, the River Trust and its trustee filed a false initial Schedule 13D. The River Trust Schedule 13D stated the River Trust and its trustee beneficially owned 1,000,000 NGBF shares, but falsely stated that Rosen had no beneficial ownership of the shares the River Trust held.

60.     Similarly, the Aspen Trust and its trustee also filed a false Schedule 13D in October 2006.  The Aspen Trust Schedule 13D stated the Aspen Trust held 1 million NGBF shares, but falsely stated that Rosen disclaimed beneficial ownership of the shares held by the Aspen Trust.

61.     Through such trusts, Rosen operated a scheme to conceal his sales activity in NGBF stock and evade the beneficial ownership reporting requirements and engaged in deceptive practices when, after the Rosen Trusts were funded with NGBF stock by Rosen, Rosen purported to disclaim beneficial ownership of those shares, but received profits from the sale and disposition of the shares in the trusts, and while failing to disclose his true beneficial ownership and secret sales of NGBF stock and profits to the public, including investors, including Alpha.

62.     From no later than June 2007 until May 2010, Rosen derived massive profits directly and indirectly from the sale of NGBF stock through three of the Rosen Trusts.  The trustee of three of the Rosen Trusts sold and transferred, through multiple brokerage accounts, NGBF shares the three trusts held and then distributed proceeds from the sales to Rosen.

63.     Rosen received at least $211,000 from the Oasis Trust's sales of NGBF stock and at least $259,000 from the Pacific Trust's sales of NGBF shares.  The trustee also transferred

NGBF shares from the Rosen Irrevocable Trust to the trustee's limited partnership, and then sold the shares and gave Rosen at least $97,000 from the sales proceeds.

64.     Further, Rosen received at least another $99,000 from a trustee of the Rosen Trust's sale of the trustee's NGBF stock.  The trustee distributed proceeds to Rosen from the trustee's sales of NGBF shares held in the trustee's individual brokerage accounts.

65.     Rosen was the named beneficiary of the Oasis Trust.  In October 2006, the Oasis Trust was funded with 488,236 NGBF shares.  Rosen did not disclose in his initial SEC filings that he directly and/or indirectly beneficially owned NGBF shares held by the Oasis Trust.

66.     In October 2009, the Oasis Trust received 500,000 NGBF shares from the Rosen Irrevocable Trust.  Later that month, the Oasis Trust trustee transferred 100,000 NGBF shares to the trustee's limited partnership and 81,619 NGBF shares to the trustee's individual brokerage account.  Despite a legal obligation to do so, Rosen failed to report these transfers to the SEC or to Alpha.

67.     From October 2009 through June 2010, the trustee of the Oasis Trust sold 312,000 Oasis Trust NGBF shares for net proceeds of approximately $259,000.  The trustee distributed approximately $211,000 of these proceeds to Rosen from the Oasis Trust brokerage account.   Rosen did not report his pecuniary interest in the Oasis Trust's NGBF share transactions that resulted in these direct profits to the SEC, as he was required to do, and did not otherwise disclose such transactions to Alpha.

68.     In Rosen's initial October 2006 SEC filings regarding his NGBF stock holdings, Rosen reported his beneficial ownership of 2,090,000 NGBF shares held in the Rosen Irrevocable Trust.  In February 2008, Rosen resigned as trustee and beneficiary, named a new trustee, and named his wife as the new beneficiary.

69.     From February through October 2009, the Rosen Irrevocable Trust trustee transferred 1,090,000 NGBF shares out of the Rosen Irrevocable Trust.  The trustee transferred 400,000 shares to himself in February 2009, 190,000 shares to the trustee's limited partnership in February 2009, and 500,000 shares to the Oasis Trust in October 2009.  Despite an obligation to do so, Rosen did not make any filings with the SEC reporting these changes in ownership.  Instead, in May 2009 and again in September 2009, Rosen filed a false Form 4 with the SEC stating that Rosen held 2,090,000 NGBF shares in the Rosen Irrevocable Trust, as if those transfers had not occurred.

70.     The Rosen Irrevocable Trust trustee sold some of the 190,000 shares he transferred from the Rosen Irrevocable Trust to his limited partnership and gave Rosen $97,000 from the sales proceeds.  Rosen did not report this transaction in his SEC filings.

71.     Rosen's wife was the named beneficiary of the Pacific Trust.  In October 2006, the Pacific Trust was funded with 678,750 NGBF shares.  However, Rosen purported to disclaim beneficial ownership of these 678,750 shares in his individual Form 3 and Schedule 13D filings with the SEC, in the very same month as he caused such shares to be transferred to the Pacific Trust.

72.     From October 2008 through June 2009, the Pacific Trust trustee transferred to Rosen approximately $259,000 in proceeds from the sale of NGBF shares the Pacific Trust received from Rosen.

73.     In January 2008, the Pacific Trust received 350,000 NGBF shares from the River Trust.  In October 2008, the Pacific Trust received an additional 422,830 NGBF shares from the River Trust.  Despite an obligation to do so, Rosen failed to report such transactions in his SEC filings.

74.     The Pacific Trust sold 480,630 NGBF shares between October 2008 and June 2009 for proceeds of approximately $592,000.   The Pacific Trust distributed approximately $259,000 of the proceeds to Rosen and the remaining $208,000 to the trustee in his individual capacity and to a limited partnership the trustee controlled.   The trustee then distributed $208,000 to Rosen, the Oasis Trust and the Rosen Irrevocable Trust.   Despite an obligation to disclose such transactions in filings with the SEC, Rosen did not disclose such transactions in filings with the SEC, or otherwise disclose such facts to Alpha.

75.     In addition, from October through December 2008, the Pacific Trust purchased 11,300 NGBF shares, and Rosen failed to report those purchases in SEC filings, despite his obligation to do so, or otherwise report such purchase to Alpha.

76.     From August through October 2008, the Rosen Irrevocable Trust trustee transferred 982,725 NGBF shares from his limited partnership brokerage account to his individual brokerage account.   From September 2008 through October 2009, the trustee sold 663,393 NGBF shares for proceeds of approximately $599,000, of which he gave Rosen $99,000.   Rosen failed to disclose the $99,000 in stock profits he derived from the trustee's sales of NGBF shares in SEC filings, or otherwise to Alpha.

77.     Rosen exercised investment control over the River Trust and the Aspen Trust. Rosen was the beneficiary of the River Trust and Rosen's son was the stated beneficiary of the Aspen Trust.

78.     In October 2006, the River Trust and the Aspen Trust were funded with 1,000,000 NGBF shares each, for a total of 2 million shares.   In his SEC filings, Rosen falsely disclaimed beneficial ownership of the 2 million NGBF shares held in these two trusts.

79.     In November 2006, one month after Rosen filed his statements disclaiming beneficial ownership of the River Trust and Aspen Trust NGBF shares, Rosen began acting as the agent for the trustees of the River Trust and Aspen Trust when he negotiated the purchase of a yacht in exchange for the transfer of the trusts' NGBF stock.

80.     Rosen located a yacht manufacturer, identified the terms of the transaction, and negotiated the transaction terms and construct contract.  The terms of the transaction included as payment for the yacht a transfer of 700,000 NGBF shares from the Aspen Trust (then valued at $3.7 million) and a transfer of $700,000 from the River Trust (obtained through a margin loan using as collateral NGBF shares held in the River Trust).

81.     The yacht manufacturer failed to timely deliver the yacht, and the Aspen Trust, the River Trust, their trustees, and Rosen filed a lawsuit in the United States District Court for the Southern District of Florida seeking return of the $4.4 million paid.  Rosen participated as a plaintiff in the litigation on his own behalf and as a named beneficiary for the use and benefit of the Aspen Trust and the River Trust.

**F.  Scienter: Common To All Defendants.**

82.     In the five year life of NGBF, NGBF produced less than $220,000 in gross revenue from the sale and licensing of all products generated from the Master License and the technology upon which it sought patents, combined.  These miniscule sales figures reflected nominal operations.  The so-called officers of NGBF did almost no work during its approximately 5 years of operations, other than work designed to generate an active market in NGBF's shares so that they could profit from personal stock sales, while continuing to be paid a wildly disproportionate salary when compared to the sales and operations of NGBF.

83.     For their work in generating less than $220,000 in gross revenue over a five year period, NGBF disclosed compensation to the Defendants and others of at least $6,581,529 for 2008, 2009 and 2010 (see **Exhibit 21**, p. 38).  In addition, Rosen took home at least undisclosed stock sale proceeds of $5,066,000, $4.4 million of which he had earmarked to purchase a luxury yacht for himself. Under the Defendants' stewardship, against less than $220,000 in gross sales, NGBF suffered extraordinary losses of $5.4 million in 2006; $8.6 million in 2007; $13.5 million in 2008; $14.4 million in 2009 and $11.6 million in 2010, or a total of $53.5 million.

84.     Plaintiff is informed and believes and based thereon alleges that, the false statements and omissions made by the Defendants, as alleged herein, were made in an effort to sustain NGBF's operations during 2011 so that the Defendants, and each of them, could liquidate as much of Defendants' remaining NGBF stockholdings into the public market and pay themselves as much cash as possible before NGBF, inevitably, would run out of money, cease operations, and have its stock discontinue trading. Without Alpha's investments from 2008 through 2011, NGBF would have been unable to survive because it would have been without sufficient cash reserves to continue to operate and meet its SEC reporting requirements.  As such, NGBF would have been unable to access the capital markets to support its operations, and thus unable to continue to exist.  Accordingly, each of the Defendants would not have been able to receive the extraordinary compensation that they did receive, in terms of both salary, securities issued to them by NGBF and stock sales into a lucrative public market, without Alpha's investment.  Alpha would not have invested in NGBF had it known the true value of the Master License, the true status of the patent applications or the fact that Rosen, who personally sold Alpha on its 2011 investment, had owned and dumped many millions of dollars of NGBF stock

31

into the public markets through secretly owned and controlled trusts in violation of the federal securities laws.

85.     As such, each of the Defendants was directly and substantially motivated to mislead Alpha into making its investments in 2011 into NGBF.

**G.  <u>Scienter – Rosen:</u>**

86.     Rosen had both motive and opportunity to commit the fraud on Alpha.   In addition, the facts as alleged herein constitute strong circumstantial evidence of conscious misbehavior or recklessness by Rosen resulting in the deception of Alpha in connection with its 2011 investments.

87.     Rosen's scheme to conceal his own stock ownership and trading in NGBF stock, through numerous trusts, in violation of the federal securities laws, as alleged above, reflects Rosen's intent to deceive and defraud NGBF's investors, including Alpha.   At the very least, such violations of the federal securities laws by a person with extensive training, experience, education and former licenses in securities law and transactions reflect recklessness by Rosen.

88.     Rosen, as Chairman of the Board of Directors of NGBF, and signatory on NGBF's 2006, 2007, 2008 and 2009 Form 10-K filings, exercised control over the content of those filings and of the public dissemination of those filings to investors and potential investors, including Alpha, through the filing of such documents with the SEC.

89.     Rosen was highly and extraordinarily motivated to defraud Alpha into investing in NGBF, while he continued to liquidate his stock, through secret trusts, into an unsuspecting public market.   The false statements and omissions made by Rosen or his aiders and abettors and co-conspirators, as alleged herein, were made in an effort to sustain NGBF's operations during 2011 so that Rosen could liquidate as much of Rosen's remaining NGBF stockholdings into the

public market as possible before NGBF, inevitably, would run out of money, cease operations, and have its stock discontinue trading. NGBF would have run out of cash to maintain its operations by no later than April 2011 had Alpha not made its 2011 investments. If NGBF had run out of cash in early 2011, NGBF would have been forced to cease operations entirely at that time, a reportable event under applicable securities laws. Upon disclosing that event to the public, NGBF's stock would have lost all public marketability of its stock, the price of which would go to near zero or would have stopped trading altogether. In fact, shortly after Alpha stopped investing in NGBF in the second half of 2011, NGBF did stop operating and its stock did stop trading and the stock price did go to zero. By persuading Alpha to invest in NGBF in 2010 and 2011, Rosen was able to keep NGBF operating and thereby maintain a public market for NGBF stock from which Rosen generated hundreds of thousands of dollars through the secretive sale of his NGBF stock held in various trusts.

90.     Rosen was paid $920,863 and $300,000 in cash and securities in 2006 and 2007, respectively (See **Exhibit 18**, p. 54); as well as $180,000, $2,272,086 and $346,991 in 2008, 2009 and 2010 (See Exhibit 21, p. 38). As of December 31, 2007, Rosen owned a beneficial interest in more than 3.1 million shares of NGBF, which shares he secretly liquidated in 2011 for substantial profits. Rosen would not have been able to liquidate his remaining NGBF shares had he not defrauded Alpha into investing over $1.1 million into NGBF in 2011.

91.     Rosen was particularly motivated to maintain the liquidity and market value of NGBF stock because the yacht transaction, discussed above, was funded with a transfer of NGBF shares, and a pledge of additional shares of stock. If the value of the pledge stock dropped, Rosen would suffer a margin call which, if not met, would jeopardize his $4.4 million yacht purchase.

92.     Plaintiff is informed and believes that Rosen was the principal architect of the fraud perpetrated against Alpha and that Rosen was assisted in such fraudulent scheme by the knowing participation and actions of the other Defendants, and each of them.  Rosen not only personally solicited such investments from Plaintiff, but did so while secretly selling his stock in NGBF into the public market through an array of undisclosed trusts.  To accomplish such scheme, Rosen enlisted and orchestrated a team of accomplices, including each of the Defendants, that worked with him either knowingly or recklessly to conceal his NGBF stock ownership and sales, and his influence over NGBF, while overstating to investors, including Alpha, the value of the Master License and the viability of the all-important patent applications; and while concealing Rosen's NGBF stock holdings and sales in violation of the federal securities laws.   In doing so, Rosen and the other Defendants pumped the NGBF stock, while dumping their NGBF stock without disclosure to the public into an inflated public market. While selling such shares into the public market, Rosen and the other Defendants, and each of them, were in possession of material non-public information – namely the true value of the Master License, which was zero; the true viability of the patent applications, which was none because they had already been rejected based on incurable deficiencies, and that Rosen was concealing his ownership and sales of NGBF stock in violation of the federal securities laws.

93.     The fraudulent scheme upon which this action is premised began in 2006, following a tried and true game plan for his fraudulent schemes in the past and continuing with a different scheme to this day.  Rosen's scheme goes like this:  he finds a "hot" industry that the general public knows little about, but which is at the cutting edge of some new wave of excitement – in this case bio-technology alternative fuels.  With energy prices skyrocketing, demand for independence from foreign fuel sources at an all-time high, and environmental

concerns more popular than ever, investors flock to biofuel technology in the hope of being at the forefront of a major new industry.  Rosen specializes in defrauding those investors.

94.     The first step in the Rosen securities fraud scheme is to create the false perception that his publicly traded company owns or licenses valuable intellectual property rights to innovations on the cutting edge of the hot new industry.  Here, that illusion was created based on a February 22, 2006 Memorandum of Understanding and a February 28, 2006 Exclusive License Agreement between "Newco (Lee Rosen's company to be formed)", which later became H2Diesel, Inc., and thereafter, effective March 28, 2009, was renamed New Generation Biofuels Holdings, Inc., on the one hand, and purported inventor, Ferdinando Petrucci ("Petrucci"), on the other hand.  Petrucci, a purported foreign inventor, warranted that he had invented an additive that was "patentable"; that would "pass all stability tests", "capable of mass production".  For this product, for which there was no historical sales or revenue and no patent or patent applications, Rosen's new company (which later became NGBF) promised to pay Petrucci $11 million and 12.5% of Newco, for the exclusive rights in such "patentable" technology.  From the outset, Rosen knew that such license rights were valueless and would never be patented. Nevertheless, by promising to pay 12.5% of Newco and $11 million for the license of such technology, Rosen created the illusion that the worthless technology he purchased from Petrucci actually had a value of more than $11 million.  Mr. Festuccia, who purported for the life of NGBF, to be NGBF's Chief Technology Officer, provided cover for Rosen's deception.  Rosen did not care what the underlying value of the Master License was, because he would profit from the fraudulent manipulation of investors and secretive stock sales, not from the operations of the company or the utilization of the patent rights.

35

95.     The next step in the Rosen scheme is to move the intellectual property and its vastly overstated valuation into a publicly traded shell, so that investors, including Alpha, who were duped into believing the hype of such product and valuation, would have an apparent avenue to liquidate their investments.   Rosen created H2Diesel, Inc., which was renamed New Generation Biofuels Holdings, Inc.   In this First Amended Complaint, references to NGBF shall also refer to H2Diesel, Inc., when referring to the company before March 28, 2008, and New Generation Biofuels Holdings, Inc., when referring to the company after March 28, 2008. NGBF's shares were registered with the SEC and sold into the public market.

96.     The final step in the Rosen fraudulent scheme is to lure investors into the publicly traded company based on false representations of the value and patentability of the licensed technology and the concocted License Agreement, so that Rosen and his co-conspirators could sell their shares in the company into a liquid public market.   As the SEC alleged in great detail at **Exhibit 16** and Plaintiff has alleged above, Rosen concealed his true ownership and sales of NGBF stock from Alpha and from the public by holding and liquidating his stock holdings in NGBF through secret trusts, the funds from which were used to benefit Rosen directly, including purchasing a $4 million luxury yacht for Rosen.

### H. Festuccia – Scienter.

97.     Festuccia had both motive and opportunity to commit the fraud on Alpha.   In addition, the facts as alleged herein constitute strong circumstantial evidence of conscious misbehavior or recklessness by Festuccia resulting in the deception of Alpha in connection with its 2011 investments.

98.     Festuccia is a close ally and cohort of Rosen.   Festuccia was intimately involved in the scheme from the very beginning, and indeed was a signatory as a "witness" on the

Memorandum of Understanding signed by Rosen and Petrucci upon which the Master License Agreement was based.  Festuccia was the purported Chief Technology Officer of NGBF throughout its existence, and, as such, supervised, signed off on, and approved all of NGBF's patent applications and the value of the Master License Agreement.  NGBF was exclusively a technology company, and Festuccia was the chief executive responsible for such technology. None of the misrepresentations and omissions set forth herein could have been accomplished without the knowing participation of Festuccia.

99.    Festuccia was motivated to defraud Alpha into investing in NGBF, while he continued to liquidate his stock, into an unsuspecting public market.  As alleged above with respect to Rosen, the false statements and omissions made by Festuccia or his aiders and abettors and co-conspirators, as alleged herein, were made in an effort to sustain NGBF's operations during 2011 so that Festuccia could liquidate as much of Festuccia's remaining NGBF stockholdings into the public market as possible before NGBF, inevitably, would run out of money, cease operations, and have its stock discontinue trading. By persuading Alpha to invest in NGBF in 2010 and 2011 on a secured basis, collateralized by fraudulently overvalued assets, including a worthless Master License Agreement valued fictitiously at over $5 million, Festuccia was able to keep NGBF operating and thereby maintain a public market for NGBF stock from which Festuccia generated hundreds of thousands of dollars through the sale of his NGBF stock.

100.    NGBF reported Festuccia's earnings paid by NGBF for 2006 of $210,371; and for 2007 of $243,296, plus 500,000 in options to purchase NGBF stock.  See **Exhibit 18,** pp. 54, 55. Festuccia was reported to be the beneficial owner of at least 657,500 shares of NGBF stock at the end of 2007.  **Exhibit 18,** p. 59.  Plaintiff is informed and believes that Festuccia continued to receive compensation for his role as Chief Technology Officer in 2008, 2009, 2010 and 2011,

and continued to liquidate his substantial NGBF stock holdings into the public market in 2010 and 2011, although such information is not disclosed in NGBF's Form 10-K reports.

### I.   **Mack – Scienter.**

101.   Mack had both motive and opportunity to commit the fraud on Alpha.  In addition, the facts as alleged herein constitute strong circumstantial evidence of conscious misbehavior or recklessness by Mack resulting in the deception of Alpha in connection with its 2011 investments.

102.   Mack, as a Director of NGBF's Board of Directors from 2007 through May 7, 2010, and thereafter as Chairman of NGBF's Board of Directors, from May 7, 2010 to the present, signed and caused to be published NGBF's Form 10Ks for 2007 (See **Exhibit 18**, p. 63); 2008 (See **Exhibit 19**, p. 52); 2009 (see **Exhibit 20**, p. 35); and 2010 (See **Exhibit 21**, p. 52). Mack exercised control over the content of those filings and of the public dissemination of those filings to investors and potential investors, including Alpha, through the filing of such documents with the SEC.

103.   Mack was motivated to defraud Alpha into investing in NGBF, while he continued to receive cash compensation and liquidate his stock, into an unsuspecting public market.  As alleged above with respect to Rosen, the false statements and omissions made by Mack or his aiders and abettors and co-conspirators, as alleged herein, were made in an effort to sustain NGBF's operations during 2011 so that Mack could liquidate as much of Mack's remaining NGBF stockholdings into the public market and pay himself as much cash as possible before NGBF, inevitably, would run out of money, cease operations, and have its stock discontinue trading.  By persuading Alpha to invest in NGBF in 2010 and 2011, Mack was able

to keep NGBF operating and thereby maintain a public market for NGBF stock from which Mack generated hundreds of thousands of dollars through the sale of his NGBF stock.

104.    Mack was paid by NGBF $787,607 in cash and stock options in 2007 (See **Exhibit 18**, p. 57) and held 109,375 NGBF shares at the end of 2007 (see **Exhibit 18**, p. 59). NGBF's Form 10K for 2010 also reported compensation paid to Mack in cash of $67,000 and that he held 261,051 NGBF shares.  **Exhibit 21**, pp. 45 and 47.  Plaintiff is informed and believes that Mack continued to receive substantial compensation for his role as Director, and later, Chairman of the Board of Directors, in 2008, 2009, 2010 and 2011, and continued to liquidate his substantial NGBF stock holdings into the public market in 2010 and 2011, although such information is not disclosed in NGBF's Form 10-K reports.

105.    Mack would not have received all, or a substantial portion of such compensation, had he not deceived Alpha into investing in NGBF in 2011.

**J.  Gillespie – Scienter.**

106.    Gillespie had both motive and opportunity to commit the fraud on Alpha.  In addition, the facts as alleged herein constitute strong circumstantial evidence of conscious misbehavior or recklessness by Gillespie resulting in the deception of Alpha in connection with its 2011 investments.

107.    Gillespie, as President, Chief Executive Officer and Director of NGBF from October 2006 through March 2009, signed and caused to be published NGBF's Form 10K for 2007 (See **Exhibit 18**, p. 63).  Gillespie received a lucrative severance package upon resigning immediately before the 2008 Form 10K was published.  Gillespie exercised control over the content of the 2007 Form 10K filing and of the public dissemination of that filing to investors and potential investors, including Alpha, through the filing of such documents with the SEC.

39

108.    Gillespie was motivated to defraud investors, including Alpha, into investing in NGBF, while he continued to receive cash compensation and liquidate his stock, into an unsuspecting public market.  The false statements and omissions made by Gillespie or his aiders and abettors and co-conspirators, as alleged herein, were made in an effort to sustain NGBF's operations so that Gillespie could liquidate as much of Gillespie's remaining NGBF stockholdings into the public market and pay himself as much cash as possible before NGBF, inevitably, would run out of money, cease operations, and have its stock discontinue trading. From the outset of NGBF in 2006, NGBF could not exist, operate and pay its officers without duping investors into investing into NGBF.  If such investors knew the truth about the absence of any value in the Master License Agreement and that the patent applications had no value, Gillespie would not have been paid his compensation and could not sell his substantial NGBF stock holdings.

109.    Gillespie was paid by NGBF $223,472 and $788,032 in cash and stock options in 2006 and 2007 (See **Exhibit 18**, p. 54) and held 809,375 NGBF shares at the end of 2007 (see **Exhibit 18**, p. 59).  Plaintiff is informed and believes that Gillespie continued to receive substantial compensation for his role as President, Chief Executive Officer and Director of NGBF through his resignation in March 2009, and received a lucrative cash and stock severance package from NGBF upon his resignation; although such information is not disclosed in NGBF's Form 10-K reports.

K. **Claiborne – Scienter.**

110.    Claiborne had both motive and opportunity to commit the fraud on Alpha.  In addition, the facts as alleged herein constitute strong circumstantial evidence of conscious

misbehavior or recklessness by Claiborne resulting in the deception of Alpha in connection with its 2011 investments.

111.    Claiborne, as NGBF's Chief Financial Officer from December 2007 through March 2010; and as Chief Executive Officer and President of NGBF from March 2009 through October 8, 2010, signed and caused to be filed with the SEC and published to investors, including Alpha, NGBF's Form 10Ks for 2007 (See **Exhibit 18**, p. 63); 2008 (**Exhibit 19**, p. 52); and 2009 (see **Exhibit 20**, p. 35).  Claiborne exercised control over the content of those filings and of the public dissemination of those filings to investors and potential investors, including Alpha, through the filing of such documents with the SEC.

112.    Claiborne was motivated to defraud Alpha into investing in NGBF, while he continued to receive cash compensation and liquidate his stock, into an unsuspecting public market.  As alleged above with respect to Rosen, the false statements and omissions made by Claiborne or his aiders and abettors and co-conspirators, as alleged herein, were made in an effort to sustain NGBF's operations during 2011 so that Claiborne could liquidate as much of Claiborne's remaining NGBF stockholdings into the public market and pay himself as much cash as possible before NGBF, inevitably, would run out of money, cease operations, and have its stock discontinue trading. By persuading Alpha to invest in NGBF in 2010 and 2011, Claiborne was able to keep NGBF operating and thereby maintain a public market for NGBF stock from which Claiborne generated hundreds of thousands of dollars through the sale of his NGBF stock.

113.    Claiborne was paid by NGBF $344,404 in cash and stock options in 2008; $1,621,252 in 2009 and $461,632 in 2010 (See **Exhibit 21**, p. 38) and held 3,451,377 NGBF shares at the end of 2010 (see **Exhibit 21**, p. 47).

114.    Claiborne would not have received all, or a substantial portion of such compensation, and would not have been able to liquidate his very substantial stockholdings in NGBF stock had he not deceived Alpha into investing in NGBF in 2011.

**L.  Goebel – Scienter.**

115.    Goebel had both motive and opportunity to commit the fraud on Alpha.  In addition, the facts as alleged herein constitute strong circumstantial evidence of conscious misbehavior or recklessness by Goebel resulting in the deception of Alpha in connection with its 2011 investments.

116.    Goebel, as NGBF's Vice President of Global Sourcing and Supply Chain from September 2007 through July 2009; Chief Operating Officer from July 2009 to the present and Principal Executive Officer from March 2011 to the present, signed and caused to be filed with the SEC and published to investors, including Alpha, NGBF's Form 10K for 2010 (**Exhibit 21**, p. 52).  Goebel exercised control over the content of those filings and of the public dissemination of those filings to investors and potential investors, including Alpha, through the filing of such documents with the SEC.  Goebel was also one of the executives who directly communicated and solicited Alpha through telephone calls and email, and caused to be published its 2011 Business Plan, Technology Briefing and finance plan, as alleged above.

117.    Goebel was motivated to defraud Alpha into investing in NGBF, while he continued to receive cash compensation and liquidate his stock, into an unsuspecting public market.  As alleged above with respect to Rosen, the false statements and omissions made by Goebel or his aiders and abettors and co-conspirators, as alleged herein, were made in an effort to sustain NGBF's operations during 2011 so that Goebel could liquidate as much of Goebel's remaining NGBF stockholdings into the public market and pay himself as much cash as possible

before NGBF, inevitably, would run out of money, cease operations, and have its stock discontinue trading. By persuading Alpha to invest in NGBF in 2010 and 2011, Goebel was able to keep NGBF operating and thereby maintain a public market for NGBF stock from which Goebel generated hundreds of thousands of dollars through the sale of his NGBF stock.

118.     Goebel was paid by NGBF $610,674 in cash and stock options in 2009; and $362,890 in 2010 (See **Exhibit 21**, p. 38) and held 672,446 NGBF shares at the end of 2010 (see **Exhibit 21**, p. 47).  Plaintiff is informed and believes that Goebel continued to receive very substantial compensation in the form of cash and stock in 2011.

119.     Goebel would not have received all, or a substantial portion of such compensation, and would not have been able to liquidate his very substantial stockholdings in NGBF stock had he not deceived Alpha into investing in NGBF in 2011.

**M. Saglio – Scienter.**

120.     Saglio had both motive and opportunity to commit the fraud on Alpha.  In addition, the facts as alleged herein constitute strong circumstantial evidence of conscious misbehavior or recklessness by Saglio resulting in the deception of Alpha in connection with its 2011 investments.

121.     Saglio, as NGBF's Chief Financial Officer from March 2010 to the present, signed and caused to be filed with the SEC and published to investors, including Alpha, NGBF's Form 10K for 2010 (**Exhibit 21**, p. 52).  Saglio exercised control over the content of those filings and of the public dissemination of those filings to investors and potential investors, including Alpha, through the filing of such documents with the SEC.  Saglio was also one of the executives who directly communicated and solicited Alpha through telephone calls and email, and caused to be published its 2011 Business Plan, Technology Briefing and finance plan, as alleged above.

122.   Saglio was motivated to defraud Alpha into investing in NGBF, while he continued to receive cash compensation and liquidate his stock, into an unsuspecting public market.  As alleged above with respect to Rosen, the false statements and omissions made by Saglio or his aiders and abettors and co-conspirators, as alleged herein, were made in an effort to sustain NGBF's operations during 2011 so that Saglio could liquidate as much of Saglio's remaining NGBF stockholdings into the public market and pay himself as much cash as possible before NGBF, inevitably, would run out of money, cease operations, and have its stock discontinue trading. By persuading Alpha to invest in NGBF in 2010 and 2011, Saglio was able to keep NGBF operating and thereby maintain a public market for NGBF stock from which Saglio generated hundreds of thousands of dollars through the sale of his NGBF stock.

123.   Saglio was paid by NGBF cash and stock options of $381,600 in 2010 (See **Exhibit 21**, p. 38) and held 1,000,000 NGBF shares at the end of 2010 (see **Exhibit 21**, p. 47). Plaintiff is informed and believes that Saglio continued to receive substantial compensation in cash and NGBF stock and stock options throughout 2011.

124.   Saglio would not have received all, or a substantial portion of such compensation, and would not have been able to liquidate his very substantial stockholdings in NGBF stock had he not deceived Alpha into investing in NGBF in 2011.

### FIRST CLAIM FOR RELIEF

*Securities Fraud; Violation of Section 10b against all Defendants*

125.   Plaintiff realleges paragraphs 1 through 124.

126.   As set forth above, Defendants, and each of them, made misrepresentations to Alpha that were material to Alpha's decisions to make the investments set forth above directly in NGBF and to purchase securities issued by NGBF, including the following:

a. That the value of NGBF's Master License Agreement was fairly stated in the Form 10K reports filed by NGBF with the SEC for the years ended December 31, 2006, 2007, 2008, 2009 and 2010 at between $8 million and $5 million;

b. That the valuations attributed to the Master License Agreement in each of such Form 10K reports reflected an actual and periodic appraisal conducted by competent professionals based on an assessment of future profits to be generated from such license;

c. That NGBF, whose business was wholly dependent on its ability to protect its technology rights,  had viable patent applications pending for cutting edge technologies at all times in 2006, 2007, 2008, 2009, 2010 and 2011, within the United States with the USPTO and internationally under the PCT and that with respect to all such patent applications, no issues had arisen and that NGBF expected that such patent applications would be granted in the ordinary course of the patent application process of those patent agencies;

d. On page 7 of the February 1, 2011 Subscription Agreement (**Exhibit 1**), Defendants, Saglio and NGBF, affirmatively misrepresented that the financial statements on file with the SEC contained all material facts required to be stated therein.

127.    Defendants, and each of them, despite speaking about the value of the Master License,  the intellectual property rights and patent applications being pursued by NGBF, omitted to disclose to Alpha the following facts known to them, that:

a. NGBF's reports on file with the SEC did not contain all material facts required to be stated therein, including such further material information as

45

was necessary to make the statements made by NGBF in light of the

circumstances not misleading, in that they omitted the following material

facts;

b.   The $11 million purchase price for the Master License Agreement which was

the principal asset of NGBF was purchased for a fraudulently excessive value

designed to perpetrate a fraudulent scheme on prospective investors premised

on the gross overvaluation of the Master License Agreement, as detailed

above;

c.   The Master License Agreement was not worth anything near the $8 to $5

million valuations set forth in NGBF's Form 10Ks filed for 2007, 2008, 2009

and 2010;

d.   No true valuation of the Master License Agreement was ever conducted by a

qualified appraiser based on reasonable projections of future profitability of

such license or otherwise, much less periodic valuations that NGBF claimed

were conducted to test such value;

e.   Most, if not all, of NGBF's patent applications lacked merit and were doomed

to failure from the outset;

f.   The International Searching Authority report dated October 23, 2007 and sent

to NGBF, through its counsel, set forth material deficiencies with respect to

all 37 patent application claims, including, among other things, incurable

deficiencies such as "the claimed invention cannot be considered novel or

cannot be considered to involve and inventive step when the document is

taken alone"; and "the claimed invention cannot be considered to involve an

inventive step when the document is combined with one or more other such documents" (see **Exhibit 22**);

g.  The European Patent Office reported to NGBF similar deficiencies on or around February 8, 2010 with respect to 15 additional patent claims, due to incurable deficiencies, including that the invention was not "particularly relevant if taken alone" and lacked "technological background" (see **Exhibit 23**);

h.  An Australian Patent Office Search Report dated and sent to NGBF on or around May 11, 2010 similarly indicated the following deficiencies with respect to 53 international patent claims:  that the document reflecting the invention was not of "particular relevance"; and that the claimed invention "cannot be considered novel or cannot be considered to involve and inventive step" (see **Exhibit 24**);

i.  International Search Reports dated July 20, 2011 and September 14, 2011 similarly noted the following deficiencies with respect to all 23 patent claims on NGBF's Glycerin inventions:  "the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone" (see **Exhibits 25, 26**);

j.  International Searching Agency report from the European Patent Office to NGBF on or around November 8, 2011 detailed similar deficiencies with respect to its Glycerin Patent application claims (see **Exhibit 28**); and

k.   NGBF had withdrawn claims 1-37 that had been filed with the USPTO; and claims 38-89 were rejected by the USPTO on December 28, 2011 (see **Exhibit 29**).

l.   Emails from Dave Goebel on October 19, 2011 and Andrea Festuccia on October 26, 2011, alleged above, expressly discussed NGBF's patent pending technologies, without mentioning that the International Searching Authority and European Patent Offices had already indicated incurable deficiencies with respect to all or substantially all pending patent applications.

m.   Rosen had engaged in a scheme to evade disclosure of his ownership and sales of NGBF stock in violation of the federal securities laws, perpetrated at the same time that Rosen was soliciting Alpha's investment of NGBF, as alleged in detail above.

128.   Plaintiff is informed and believes and based thereon alleges that the Defendants, and each of them, participated knowingly and jointly in the fraudulent scheme as detailed above and took all actions alleged herein in a successful effort to defraud Alpha into investing over $2 million, including over $1 million in 2011, so that the Defendants, and each of them, could continue to receive massive compensation for running a company with virtually no operations, through cash payments and the issuance and sales of stock through into a fraudulently inflated public stock market; and so that Rosen's $4.4 million yacht purchase, financed in part with a pledge of NGBF stock, could close.

129.   Plaintiff is further informed and believes that the Defendants, and each of them, knowingly perpetrated in the fraudulent scheme alleged herein, acting in concert with the other named Defendants, in violation of Section 10(b) of the Securities and Exchange Act of 1934 and

the Rules of the Securities and Exchange Commission promulgated thereunder, by:  (i) making the misrepresentations alleged herein; and (ii) omitting and concealing from Alpha the foregoing material information in connection with the foregoing factual misrepresentations which would have made Plaintiff aware that such statements were false.

130.    Plaintiff made the investments in NGBF described above, and purchased the securities issued by NGBF, described above, including paying over $1 million for such investments in 2011.  Plaintiff was unaware that the misrepresentations alleged herein were false and unaware of the material facts alleged herein that were omitted from the Defendants' statements.  Had Plaintiff known the truth about the foregoing misrepresentations and omissions, it would not have invested such funds into NGBF and thus would not have suffered the total loss of such investments.

131.    Defendants failed to disclose to Plaintiff the truth with respect to the misrepresentations and omissions alleged above, and, instead, restated the misrepresentations and omitted the same material facts on several occasions, as alleged above, during the period 2008 through November 2011.

132.    Plaintiff alleges that such wrongful acts by Defendants, and each of them, have directly resulted in Plaintiff making the investments alleged herein, which investments have resulted in losses to Plaintiff, in whole or in substantial part, of their investments, in an amount exceeding $1 million.

133.    Plaintiff is informed and believes and based thereon alleges that in making the false statements and omissions alleged above, Defendants, and each of them, acted with the wrongful and malicious intent to deceive Plaintiff for the purpose of soliciting investments from it in reliance on such false representations and material omissions.

49

134.    Plaintiff reasonably and actually relied upon Defendants' false statements and duty to disclose material information affecting Plaintiff, to its direct and substantial detriment. Alpha's reliance on the existence of patentable technologies and NGBF's public filings claiming the value of the Master License Agreement to have a value of over $5 million is particularly evident in the fact that in making Alpha's 2011 investments, Alpha insisted on and received a security interest in substantially all of NGBF's assets, including, without limitation, its contract rights, license rights and intellectual property rights.  See **Exhibits 2 and 3**.

135.    As a result of Defendants' false statements and material omissions, Plaintiff has suffered damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

*Common Law Fraud against all Defendants*

136.    Plaintiff realleges paragraphs 1 through 135.

137.    As set forth above, Defendants, and each of them, made misrepresentations to Alpha that were material to Alpha's decisions to make the investments set forth above directly in NGBF and to purchase securities issued by NGBF, including the following:

a.  That the value of NGBF's Master License Agreement was fairly stated in the Form 10K reports filed by NGBF with the SEC for the years ended December 31, 2006, 2007, 2008, 2009 and 2010 at between $8 million and $5 million;

b.  That the valuations attributed to the Master License Agreement in each of such Form 10K reports reflected an actual and periodic appraisal conducted by competent professionals based on an assessment of future profits to be generated from such license;

    c.   That NGBF, whose business was wholly dependent on its ability to protect its technology rights,  had viable patent applications pending for cutting edge technologies at all times in 2006, 2007, 2008, 2009, 2010 and 2011, within the United States with the USPTO and internationally under the PCT, that no issues had arisen with respect to all such patent applications, and that NGBF expected that such patent applications would be granted in the ordinary course of the patent application process of those patent agencies;

    d.   On page 7 of the February 1, 2011 Subscription Agreement (**Exhibit 1**), Defendants, Saglio and NGBF, affirmatively misrepresented that the financial statements on file with the SEC contained all material facts required to be stated therein.

138.    Defendants, and each of them, despite speaking about the value of the Master License, the intellectual property rights and patent applications being pursued by NGBF, omitted to disclose to Alpha the following facts known to them:

    a.   NGBF's reports on file with the SEC did not contain all material facts required to be stated therein, including such further material information as was necessary to make the statements made by NGBF in light of the circumstances not misleading, in that they omitted the following material facts;

    b.   The $11 million purchase price for the Master License Agreement which was the principal asset of NGBF was purchased for a fraudulently excessive value designed to perpetrate a fraudulent scheme on prospective investors premised

on the gross overvaluation of the Master License Agreement, as detailed above;

c.  The Master License Agreement was not worth anything near the $8 to $5 million valuations set forth in NGBF's Form 10Ks filed for 2007, 2008, 2009 and 2010;

d.  No true valuation of the Master License Agreement was ever conducted by a qualified appraiser based on reasonable projections of future profitability of such license or otherwise, much less periodic valuations that NGBF claimed were conducted to test such value;

e.  Most, if not all, of NGBF's patent applications lacked merit and were doomed to failure from the outset;

f.  The International Searching Authority report dated October 23, 2007 and sent to NGBF, through its counsel, set forth material deficiencies with respect to all 37 patent application claims, including, among other things, incurable deficiencies such as "the claimed invention cannot be considered novel or cannot be considered to involve and inventive step when the document is taken alone"; and "the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents" (see **Exhibit 22**);

g.  The European Patent Office reported to NGBF similar deficiencies on or around February 8, 2010 with respect to 15 additional patent claims, due to incurable deficiencies, including that the invention was not "particularly

relevant if taken alone" and lacked "technological background" (see **Exhibit 23**);

h.  An Australian Patent Office Search Report dated and sent to NGBF on or around May 11, 2010 similarly indicated the following deficiencies with respect to 53 international patent claims:  that the document reflecting the invention was not of "particular relevance"; and that the claimed invention "cannot be considered novel or cannot be considered to involve and inventive step" (see **Exhibit 24**);

i.  International Search Reports dated July 20, 2011 and September 14, 2011 similarly noted the following deficiencies with respect to all 23 patent claims on NGBF's Glycerin inventions:  "the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone" (see **Exhibits 25, 26**);

j.  International Searching Agency report from the European Patent Office to NGBF on or around November 8, 2011 detailed similar deficiencies with respect to its Glycerin Patent application claims (see **Exhibit 28**); and

k.  NGBF had withdrawn claims 1-37 that had been filed with the USPTO; and claims 38-89 were rejected by the USPTO on December 28, 2011 (see **Exhibit 29**).

l.  Emails from Dave Goebel on October 19, 2011 and Andrea Festuccia on October 26, 2011, alleged above, expressly discussed NGBF's patent pending technologies, without mentioning that the International Searching Authority

and European Patent Offices had already indicated incurable deficiencies with

respect to all or substantially all pending patent applications.

m. Rosen had engaged in a scheme to evade disclosure of his ownership and sales

of NGBF stock in violation of the federal securities laws, perpetrated at the

same time that Rosen was soliciting Alpha's investment of NGBF, as alleged

in detail above.

139.    Plaintiff is informed and believes and based thereon alleges that the Defendants,

and each of them, participated knowingly and jointly in the fraudulent scheme as detailed above

and took all actions alleged herein in a successful effort to defraud Alpha into investing over $2

million, including over $1 million in 2011, so that the Defendants, and each of them, could

continue to receive massive compensation for running a company with virtually no operations,

through cash payments and the issuance and sales of stock through into a fraudulently inflated

public stock market; and so that Rosen's $4.4 million yacht purchase, financed in part with a

pledge of NGBF stock, could close.

140.    Plaintiff is further informed and believes that the Defendants, and each of them,

knowingly perpetrated in the fraudulent scheme alleged herein, acting in concert with the other

named Defendants, by:  (i) making the misrepresentations alleged herein; and (ii) omitting and

concealing from Alpha the foregoing material information in connection with the foregoing

factual misrepresentations which would have made Plaintiff aware that such statements were

false.

141.    Plaintiff made the investments in NGBF described above, and purchased the

securities issued by NGBF, described above, including paying over $1 million for such

investments in 2011.  Plaintiff was unaware that the misrepresentations alleged herein were false

and unaware of the material facts alleged herein that were omitted from the Defendants' statements.  Had Plaintiff known the truth about the foregoing misrepresentations and omissions, it would not have invested such funds into NGBF and thus would not have suffered the total loss of such investments.

142.    Defendants failed to disclose to Plaintiff the truth with respect to the misrepresentations and omissions alleged above, and, instead, restated the misrepresentations and omitted the same material facts on several occasions, as alleged above, during the period 2008 through November 2011.

143.    Plaintiff alleges that such wrongful acts by Defendants, and each of them, have directly resulted in Plaintiff making the investments alleged herein, which investments have resulted in losses to Plaintiff, in whole or in substantial part, of its investments, in an amount exceeding $1 million.

144.    Plaintiff is informed and believes and based thereon alleges that in making the false statements and omissions alleged above, Defendants, and each of them, acted with the wrongful and malicious intent to deceive Plaintiff for the purpose of soliciting investments from it in reliance on such false representations and material omissions.

145.    Plaintiff reasonably and actually relied upon Defendants' false statements and duty to disclose material information affecting Plaintiff, to its direct and substantial detriment. Alpha's reliance on the existence of patentable technologies and NGBF's public filings claiming the value of the Master License Agreement to have a value of over $5 million is particularly evident in the fact that in making Alpha's 2011 investments, Alpha insisted on and received a security interest in substantially all of NGBF's assets, including, without limitation, its contract rights, license rights and intellectual property rights.  See **Exhibits 2 and 3**.

146.    As a result of Defendants' false statements and material omissions, Plaintiff has suffered damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF

*Negligent Misrepresentation against all Defendants*

147.    Plaintiff realleges paragraphs 1 through 146.

148.    As set forth above, Defendants, and each of them, made misrepresentations to Alpha that were material to Alpha's decisions to make the investments set forth above directly in NGBF and to purchase securities issued by NGBF, including the following:

    a.    That the value of NGBF's Master License Agreement was fairly stated in the Form 10K reports filed by NGBF with the SEC for the years ended December 31, 2006, 2007, 2008, 2009 and 2010 at between $8 million and $5 million;

    b.    That the valuations attributed to the Master License Agreement in each of such Form 10K reports reflected an actual and periodic appraisal conducted by competent professionals based on an assessment of future profits to be generated from such license;

    c.    That NGBF, whose business was wholly dependent on its ability to protect its technology rights,  had viable patent applications pending for cutting edge technologies at all times in 2006, 2007, 2008, 2009, 2010 and 2011, within the United States with the USPTO and internationally under the PCT, that no issues had arisen with respect to all such patent applications, and that NGBF expected that such patent applications would be granted in the ordinary course of the patent application process of those patent agencies;

56

    d.  On page 7 of the February 1, 2011 Subscription Agreement (**Exhibit 1**), Defendants, Saglio and NGBF, affirmatively misrepresented that the financial statements on file with the SEC contained all material facts required to be stated therein.

149.    Defendants, and each of them, despite speaking about the value of the Master License, the intellectual property rights and patent applications being pursued by NGBF, omitted to disclose to Alpha the following facts known to them:

    a.  NGBF's reports on file with the SEC did not contain all material facts required to be stated therein, including such further material information as was necessary to make the statements made by NGBF in light of the circumstances not misleading, in that they omitted the following material facts;

    b.  The $11 million purchase price for the Master License Agreement which was the principal asset of NGBF was purchased for a fraudulently excessive value designed to perpetrate a fraudulent scheme on prospective investors premised on the gross overvaluation of the Master License Agreement, as detailed above;

    c.  The Master License Agreement was not worth anything near the $8 to $5 million valuations set forth in NGBF's Form 10Ks filed for 2007, 2008, 2009 and 2010;

    d.  No true valuation of the Master License Agreement was ever conducted by a qualified appraiser based on reasonable projections of future profitability of

such license or otherwise, much less periodic valuations that NGBF claimed were conducted to test such value;

e.   Most, if not all, of NGBF's patent applications lacked merit and were doomed to failure from the outset;

f.   The International Searching Authority report dated October 23, 2007 and sent to NGBF, through its counsel, set forth material deficiencies with respect to all 37 patent application claims, including, among other things, incurable deficiencies such as "the claimed invention cannot be considered novel or cannot be considered to involve and inventive step when the document is taken alone"; and "the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents" (see **Exhibit 22**);

g.   The European Patent Office reported to NGBF similar deficiencies on or around February 8, 2010 with respect to 15 additional patent claims, due to incurable deficiencies, including that the invention was not "particularly relevant if taken alone" and lacked "technological background" (see **Exhibit 23**);

h.   An Australian Patent Office Search Report dated and sent to NGBF on or around May 11, 2010 similarly indicated the following deficiencies with respect to 53 international patent claims:  that the document reflecting the invention was not of "particular relevance"; and that the claimed invention "cannot be considered novel or cannot be considered to involve and inventive step" (see **Exhibit 24**);

i.   International Search Reports dated  July 20, 2011 and September 14, 2011
similarly noted the following deficiencies with respect to all 23 patent claims
on NGBF's Glycerin inventions:  "the claimed invention cannot be considered
novel or cannot be considered to involve an inventive step when the document
is taken alone" (see **Exhibits 25, 26 and 27**);

j.   International Searching Agency reported to NGBF on or around November 8,
2011 similar deficiencies with respect to its Glycerin Patent application claims
(see **Exhibit 28**); and

k.   NGBF had withdrawn claims 1-37 that had been filed with the USPTO; and
claims 38-89 were rejected by the USPTO on December 28, 2011 (see
**Exhibit 29**).

l.   Emails from Dave Goebel on October 19, 2011 and Andrea Festuccia on
October 26, 2011, alleged above, expressly discussed NGBF's patent pending
technologies, without mentioning that the International Searching Authority
and European Patent Offices had already indicated incurable deficiencies with
respect to all or substantially all pending patent applications.

m.   Rosen had engaged in a scheme to evade disclosure of his ownership and sales
of NGBF stock in violation of the federal securities laws, perpetrated at the
same time that Rosen was soliciting Alpha's investment of NGBF, as alleged
in detail above.

150.   Plaintiff is informed and believes that Defendants, and each of them, at the time
of their conduct alleged herein, owed fiduciary duties to Plaintiff with respect to the statements
made to Plaintiff in connection with the solicitation of Plaintiff's investments in NGBF because

Plaintiff was a creditor of NGBF, each of the Defendants was an officer and Director of NGBF when making such statements, and NGBF was in the zone of solvency at the time such statements, and each of them, were made.

151.    Plaintiff made the investments in NGBF described above, and purchased the securities issued by NGBF, described above, including paying over $1 million for such investments in 2011.  Plaintiff was unaware that the misrepresentations alleged herein were false and unaware of the material facts alleged herein that were omitted from the Defendants' statements.  Had Plaintiff known the truth about the foregoing misrepresentations and omissions, it would not have invested such funds into NGBF and thus would not have suffered the total loss of such investments.

152.    Defendants acted intentionally or, at a minimum, negligently, in failing to disclose to Plaintiff the truth with respect to the misrepresentations and omissions alleged above, and, instead, restating the misrepresentations and omitting the same material facts on several occasions, as alleged above, during the period 2008 through November 2011.

153.    Plaintiff alleges that such wrongful acts by Defendants, and each of them, have directly resulted in Plaintiff making the investments alleged herein, which investments have resulted in losses to Plaintiff, in whole or in substantial part, of its investments, in an amount exceeding $1 million.

154.    Plaintiff is informed and believes and based thereon alleges that in making the false statements and omissions alleged above, Defendants, and each of them, acted with the wrongful and malicious intent to deceive Plaintiff for the purpose of soliciting investments from it in reliance on such false representations and material omissions.

60

155.    Plaintiff reasonably and actually relied upon Defendants' false statements and duty to disclose material information affecting Plaintiff, to its direct and substantial detriment. Alpha's reliance on the existence of patentable technologies and NGBF's public filings claiming the value of the Master License Agreement to have a value of over $5 million is particularly evident in the fact that in making Alpha's 2011 investments, Alpha insisted on and received a security interest in substantially all of NGBF's assets, including, without limitation, its contract rights, license rights and intellectual property rights.  See **Exhibits 2 and 3**.

156.    As a result of Defendants' false statements and material omissions, Plaintiff has suffered damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

*Violation of Section 20(a) against all Defendants*

157.    Plaintiff realleges paragraphs 1 through 135.

158.    Plaintiff is informed and believes and based thereon alleges that Defendants, Rosen, Mack, Festuccia, Goebel, Gillespie, Claiborne and Saglio, at all relevant times during their respective terms as officers of NGBF, and, in the case of Rosen, at all relevant times, were control persons of NGBF within the meaning of §20(a) of the Securities and Exchange Act. Plaintiff is informed and believes and based thereon alleges that although he was not a designated officer of NGBF, Rosen directly participated and controlled all of NGBF's written and verbal statements to Alpha, through Rabinowitz, at all relevant times with respect to NGBF's solicitations of Alpha's investments in NGBF.

159.    Plaintiff is informed and believes and based thereon alleges that each such Defendant, by reason of his position with NGBF and/or his or her stock ownership in NGBF, had the power and authority to cause NGBF to engage in the wrongful conduct complained of herein.

160.     Plaintiff is informed and believes and based thereon alleges that each of such Defendant's culpably participated in making and affirming the false representations, and in failing to disclose the true information to Plaintiff, as alleged above, prior to Plaintiff making its investments, and each of them, in NGBF and/or NGBF's securities.

161.     As a result, each such Defendant is liable to Plaintiff for damages to be determined at trial.

### FIFTH CLAIM FOR RELIEF

*Breach of Fiduciary Duties against all Defendants*

162.     Plaintiff realleges paragraphs 1 through 135.

163.     Plaintiff is informed and believes and based thereon alleges that Defendants, Rosen, Mack, Festuccia, Goebel, Gillespie, Claiborne and Saglio, at all relevant times during their respective terms as officers and directors of NGBF, were control persons of NGBF and/or acted in their capacities as executives of NGBF.

164.     Plaintiff is informed and believes and based thereon alleges that at all relevant that any and all of the alleged misrepresentations and omissions were made and at all times when Alpha was solicited to make investments in NGBF and did make investments in NGBF, NGBF was insolvent, in that its liabilities exceeded its assets.  Under New York law, while a company is in the zone or vicinity of insolvency, its officers, directors and control persons owe its creditors fiduciary duties of loyalty and care.  Accordingly, at all relevant times during each Defendant's participation in the management of NGBF, as alleged above, each of the Defendants owed fiduciary duties to the creditors of NGBF, including Plaintiff, to make appropriate disclosures to those shareholders regarding the truth of its financial condition, including without limitation, the value of its Master License Agreement and the viability of its patents, and to make

all such disclosures times and in a prudent, professional, competent and loyal manner, for the benefit of such creditors.

165.    Plaintiff is informed and believes and based thereon alleges that each such Defendant, by reason of his or her position with NGBF and/or his or her stock ownership in NGBF, had the power and authority to cause NGBF to engage in the wrongful conduct complained of herein.

166.    Plaintiff is informed and believes and based thereon alleges that each of such Defendants breached such fiduciary duties by culpably participating in making and affirming the false representations, and in failing to disclose the material information to Plaintiff, as alleged above, prior to and even after Plaintiff made its investments in NGBF.

167.    As a direct and proximate result of such breaches by Defendants of their fiduciary duties owed to Plaintiff, Plaintiff invested over $1 million in NGBF in 2011, as alleged above, which investment it would not have made but for such breaches, and, as a result, Plaintiff suffered a total loss of such 2011 investments in NGBF.

168.    As a result of the foregoing, Plaintiff is entitled to an award of compensatory and punitive damages against Defendants, and each of them, in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF

*Conspiracy Against All Defendants*

169.    Plaintiff realleges paragraphs 1 through 135.

170.    Plaintiff is informed and believes and based thereon alleges that the Defendants, and each of them, made an agreement with one or more of the other Defendants, to perpetrate a fraud on Alpha, as detailed above, for the purpose of persuading Alpha to invest in NGBF securities based on false or misleading statements and omissions.

171.    Plaintiff is informed and believes that each Defendant took one or more affirmative actions in furtherance of such fraud, including those actions alleged above, and/or

concealed or omitted material facts from NGBF's public disclosures, including those omissions alleged above, with the intention of carrying out such fraudulent scheme.

172.    Plaintiff is informed and believes that Plaintiff suffered harm as a direct and proximate result of the fraudulent scheme to which the Defendants, and each of them, agreed and perpetrated.

173.    The Defendants and each of them are responsible for the harm because they were part of a conspiracy to commit a fraud on Alpha.

## SEVENTH CLAIM FOR RELIEF

### *Aiding and Abetting Against All Defendants*

174.    Plaintiff realleges paragraphs 1 through 135.

175.    Plaintiff is informed and believes and based thereon alleges that the actions of Rosen, as alleged herein, constituted a fraudulent scheme against the investors in NGBF, including Alpha, causing Alpha damages, all as alleged above in the first and second claims for relief.

176.    Plaintiff is informed and believes that each of the other Defendants knew about such fraudulent scheme to defraud Alpha.

177.    Plaintiff is informed and believes that each such Defendant, with knowledge of such fraudulent scheme, rendered substantial assistance in perpetrating such fraudulent scheme by the primary wrongdoer, Rosen, by taking the actions alleged above, including, without limitation, by signing and causing to be filed with the SEC Form 10Ks for the years 2007, 2008, 2009, and 2010, and creating and publishing a Business Plan, Technology Briefing and Finance Plan, among other statements, containing materially false and misleading statements and omitting material facts that were necessary to disclose the true facts relative to NGBF's financial condition, license, patents and shareholder sales.

178.    Plaintiff is informed and believes that Plaintiff suffered harm as a direct and proximate result of the fraudulent scheme to which the Defendants, and each of them, aided and abetted or acted as the primary violator.

179.    The Defendants and each of them are responsible for the harm because they were either the primary violator in such scheme or an aider and abettor of such fraudulent scheme.

### EIGHTH CLAIM FOR RELIEF

*Violation of Section 18 of the Securities Exchange Act (15 U.S.C. §78r)*

180.    Plaintiff realleges paragraphs 1 through 135.

181.    Plaintiff is informed and believes and based thereon alleges that the Defendants, and each of them, made or caused to be made the false statements alleged above in the Form 10K's filed with the SEC pursuant to the Securities Exchange Act by NGBF for the years ended 2007, 2008, 2009 and 2010, as alleged above, including the following:

    a.   That the value of NGBF's Master License Agreement was fairly stated in the Form 10K reports filed by NGBF with the SEC for the years ended December 31, 2006, 2007, 2008, 2009 and 2010 at between $8 million and $5 million;

    b.   That the valuations attributed to the Master License Agreement in each of such Form 10K reports reflected an actual and periodic appraisal conducted by competent professionals based on an assessment of future profits to be generated from such license;

    c.   That NGBF, whose business was wholly dependent on its ability to protect its technology rights,  had viable patent applications pending for cutting edge technologies at all times in 2006, 2007, 2008, 2009, 2010 and 2011, within the United States with the USPTO and internationally under the PCT, that no issues had arisen with respect to all such patent applications, and that NGBF expected that such patent applications would be granted in the ordinary course of the patent application process of those patent agencies;

182.     Defendants, and each of them, despite speaking about the value of the Master License, the intellectual property rights and patent applications being pursued by NGBF, omitted to disclose to Alpha the following facts known to them:

a.   NGBF's reports on file with the SEC did not contain all material facts required to be stated therein, including such further material information as was necessary to make the statements made by NGBF in light of the circumstances not misleading, in that they omitted the following material facts;

b.   The $11 million purchase price for the Master License Agreement which was the principal asset of NGBF was purchased for a fraudulently excessive value designed to perpetrate a fraudulent scheme on prospective investors premised on the gross overvaluation of the Master License Agreement, as detailed above;

c.   The Master License Agreement was not worth anything near the $8 to $5 million valuations set forth in NGBF's Form 10Ks filed for 2007, 2008, 2009 and 2010;

d.   No true valuation of the Master License Agreement was ever conducted by a qualified appraiser based on reasonable projections of future profitability of such license or otherwise, much less periodic valuations that NGBF claimed were conducted to test such value;

e.   Most, if not all, of NGBF's patent applications lacked merit and were doomed to failure from the outset;

f.  The International Searching Authority report dated October 23, 2007 and sent to NGBF, through its counsel, set forth material deficiencies with respect to all 37 patent application claims, including, among other things, incurable deficiencies such as "the claimed invention cannot be considered novel or cannot be considered to involve and inventive step when the document is taken alone"; and "the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents" (see **Exhibit 22**);

g.  The European Patent Office reported to NGBF similar deficiencies on or around February 8, 2010 with respect to 15 additional patent claims, due to incurable deficiencies, including that the invention was not "particularly relevant if taken alone" and lacked "technological background" (see **Exhibit 23**);

h.  An Australian Patent Office Search Report dated and sent to NGBF on or around May 11, 2010 similarly indicated the following deficiencies with respect to 53 international patent claims:  that the document reflecting the invention was not of "particular relevance"; and that the claimed invention "cannot be considered novel or cannot be considered to involve and inventive step" (see **Exhibit 24**);

i.  International Search Reports dated  July 20, 2011 and September 14, 2011 similarly noted the following deficiencies with respect to all 23 patent claims on NGBF's Glycerin inventions:  "the claimed invention cannot be considered

novel or cannot be considered to involve an inventive step when the document is taken alone" (see **Exhibits 25, 26 and 27**);

j.   International Searching Agency reported to NGBF on or around November 8, 2011 similar deficiencies with respect to its Glycerin Patent application claims (see **Exhibit 28**); and

k.   NGBF had withdrawn claims 1-37 that had been filed with the USPTO; and claims 38-89 were rejected by the USPTO on December 28, 2011 (see **Exhibit 29**).

l.   Rosen had engaged in a scheme to evade disclosure of his ownership and sales of NGBF stock in violation of the federal securities laws, perpetrated at the same time that Rosen was soliciting Alpha's investment of NGBF, as alleged in detail above.  Notably, Plaintiff was unaware of Defendants' false statements regarding Rosen's ownership and sales activity involving NGBF's stock until well after the SEC filed its Complaint against him on December 21, 2012.  See **Exhibit 16**.

183.   Except with respect to the 2010 10K, which was filed after the first two 2011 investments made by Alpha, Plaintiff read and actually relied on all of the SEC filings made by NGBF in determining to make such 2011 investments in NGBF.  As to the investments made by Alpha after the 2010 10K filing, Plaintiff read and actually relied on that SEC filing made by NGBF in determining to make such investments in NGBF.  In particular, Plaintiff actually relied on the valuations stated in such filings pertaining to NGBF's principal asset, the Master License Agreement, which NGBF represented to have a value of $5 million to $8 million in its various filings.  In fact, the value of such Master License Agreement was zero.  As a secured lender relying on such valuation, Alpha would not have made such loans and would not have lost such investments but for such misrepresentations in NGBF's filings.

184.   Plaintiff is informed and believes that Plaintiff suffered harm as a direct and proximate result of the false statements in the referenced filings with the SEC, including the complete loss of more than $1.1 million invested in NGBF in 2011, plus interest on such investments, attorneys' fees and costs.

185.   The Defendants and each of them are liable to Alpha for its damages pursuant to 15 U.S.C. §78r.

Wherefore, Plaintiff demands judgment against Defendants, and each of them, as follows:

i)      on the First, Second, Fourth, Fifth, and Seventh Claims for Relief --

        compensatory and punitive damages according to proof at trial; and

ii)     on the Third and Eighth Claims for Relief for compensatory damages; and

iii)    on all Claims for Relief for reasonable attorneys' fees, interest, the costs and

        disbursements of this action and for such other, further and different relief as the

        Court deems just and proper.

Dated: January 28, 2014                    CORRIGAN & MORRIS, LLP

                                           By:    /s/ Stanley C. Morris
                                                  Stanley C. Morris
                                                  Corrigan & Morris LLP
                                                  201 Santa Monica Blvd., Suite 475
                                                  Santa Monica, CA 90401
                                                  (310) 394-2828 Tel.
                                                  (310) 394-2825 Fax
                                                  scm@cormorllp.com
                                           -- and --

                                           JENKINS & LOPRESTI LLP

                                           By:    /s/ Anthony A. LoPresti
                                                  Anthony A. LoPresti
                                                  30 Broad Street, 37th Floor
                                                  New York, N.Y. 10004
                                                  (212) 757-5277 Tel.
                                                  (212) 202-4410 Fax
                                                  alopresti@jlfirm.com

                                           *Local counsel/Attorneys for the Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated:   January 28, 2014

CORRIGAN & MORRIS, LLP

By:   /s/ Stanley C. Morris
        Stanley C. Morris
        Corrigan & Morris LLP
        201 Santa Monica Blvd., Suite 475
        Santa Monica, CA 90401
        (310) 394-2828 Tel.
        (310) 394-2825 Fax
        scm@cormorllp.com

-- and --

JENKINS & LOPRESTI LLP

By:   /s/ Anthony A. LoPresti
        Anthony A. LoPresti
        30 Broad Street, 37th Floor
        New York, N.Y. 10004
        (212) 757-5277 Tel.
        (212) 202-4410 Fax
        alopresti@jlfirm.com

*Local counsel/Attorneys for the Plaintiff*