UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__11/18/2014_
```

-------------------------------------------------------- X

ALPHA CAPITAL ANSTALT,                         :
                                           :
                                           :
                         Plaintiff,        :         13-CV-5586 (VEC)
                                           :
              -against-                     :         <u>OPINION & ORDER</u>
                                           :
NEW GENERATION BIOFUELS, INC.,                 :
LEE S. ROSEN, JOHN E. MACK, ANDREA             :
FESTUCCIA, DAVID GOEBEL, DAVID A.              :
GILLESPIE, CARY J. CLAIBORNE, DIANE            :
SAGLIO,                                        :
                                           :
                         Defendants.  :
-------------------------------------------------------- X

     Plaintiff, Alpha Capital Anstalt ("Alpha"), brings this action against New Generation

Biofuels, Inc. ("NGBF" or the "Company"), the company's founder, Lee S. Rosen ("Rosen") and

six officers and directors of NGBF[1] alleging securities fraud under the Securities Exchange Act

(the "Exchange Act") and various state law claims, all arising out of losing investments that

Alpha made in NGBF in 2011.  Alpha alleges that it was fraudulently induced to invest in NGBF

as a result of Defendants' misrepresentations and omissions regarding the viability of NGBF's

pending patent applications, the value of a master license agreement covering those pending

patents and Rosen's concealed NGBF stockholdings and sales.

     The Individual Defendants have moved to dismiss principally pursuant to Federal Rules

of Civil Procedure 12(b)(6) for failure to state a claim and Rule 9(b) and the Private Securities

Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(1)-(3)(A), for failure to plead fraud

---

[1]     The other six officers and directors are referred to as the "Non-Rosen Defendants."  The Non-Rosen
Defendants and Rosen are referred to collectively as the "Individual Defendants."  The Individual Defendants and
NGBF are referred to collectively as the "Defendants."

with particularity.[2]  Defendant Festuccia has also moved to dismiss pursuant to Rule 12(b)(2) for

lack of personal jurisdiction.

 For the reasons stated below, the Individual Defendants' motion to dismiss is GRANTED

IN PART and DENIED IN PART.

## I. BACKGROUND[3]

 This action arises out of investments totaling approximately $1.19 million that Alpha, a

Lichtenstein-based company, made in NGBF between January 2011 and October 2011.[4]

 NGBF is a Florida-based biofuels start-up company that was founded by Defendant

Rosen in 2006.  First Am. Compl. ("FAC") ¶¶ 4, 26.  Rosen was Chairman of the Board of

Directors and also served as an untitled and undisclosed executive officer until May 7, 2010.  *Id.*

¶ 4.  After stepping down as Chairman of the Board, Rosen continued to exercise de facto control

over NGBF.  *Id.* ¶ 4.  Defendant Andrea Festuccia ("Festuccia"), a resident of Italy, acted as

NGBF's Chief Technology Officer throughout the Company's existence.  *Id.* ¶ 6.  All of the

other Individual Defendants were, at various times, NGBF officers or board members.[5]

---

[2] NGBF has neither answered nor filed a motion to dismiss the Complaint, and no counsel has appeared on its behalf.  The Individual Defendants do not contest the Court's subject matter jurisdiction or dispute Plaintiff's assertion that venue is proper in the Southern District of New York because (1) a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of the property which is the subject of the action is situated in New York and (2) many of the relevant investment agreements contain venue provisions calling for the resolution of disputes arising from such agreements in New York.  First Am. Compl. ¶ 13.

[3] The Court presumes the truth of the Complaint's allegations at this stage in the litigation.  *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC,* 709 F.3d 109, 119 (2d Cir. 2013).

[4] Alpha invested via promissory notes as follows: $50,000 in January 2011; $785,312.50 on February 1, 2011; $100,000 on April 15, 2011; $50,000 on May 18, 2011; $125,000 on July 5, 2011; $50,000 on August 10, 2011; and $25,000 on October 12, 2011, for a total of $1,185,312.50.  FAC ¶ 16.

[5] Defendant John E. Mack ("Mack") was director of NGBF from February 2007 through May 7, 2010, and thereafter held the title of Chairman of the Board.  *Id.* ¶ 5.  Defendant David A. Gillespie ("Gillespie") was NGBF's President and Chief Executive Officer from October 2006 through March 2009.  *Id.* ¶ 7.  Defendant Cary J. Claiborne ("Claiborne") was NGBF's Chief Financial Officer from December 2007 through March 2010 and was NGBF's President and Chief Executive Officer from March 2009 through October 8, 2010.  *Id.* ¶ 8.  David Goebel ("Goebel") was NGBF's Vice President of Global Sourcing and Supply Chain from September 2007 through July

NGBF's primary asset was a master license agreement with Ferdinando Petrucci (the "Master License Agreement"), under which NGBF held licenses to intellectual property rights in a variety of biofuel technologies for which it had patent applications pending. *Id.* ¶¶ 26, 30-31.[6] The Master License Agreement covered the exploitation of those technologies in North America, Central America and the Caribbean. *Id.* ¶¶ 26, 31, 34-35. Apart from the Master License Agreement, NGBF had very few assets. *Id.* ¶ 26.

### A. NGBF's Patent Applications

On April 27, 2006 and April 10, 2007, NGBF filed applications with the United States Patent and Trademark Office ("USPTO") and various international patent receiving offices for 37 patent claims based on an additive allegedly created by Mr. Petrucci (the "Petrucci Patent Applications"). *Id.* ¶ 36. On October 23, 2007, NGBF received a report from the International Search Authority ("ISA") regarding the Petrucci Patent Applications. ISA is an organization authorized under the Patent Cooperation Treaty ("PCT") to conduct preliminary examinations of patent claims. *Id.* ¶¶ 36 n.1, 40. The ISA Report made negative findings, noting, *inter alia*, that the Petrucci Patent Applications (1) were "not considered to be of particular relevance" and (2) "cannot be considered novel or cannot be considered to involve an inventive step." *Id.* ¶ 40.

In 2010, based on technology allegedly invented by Defendant Festuccia, NGBF filed approximately 40 additional patent claims with the USPTO and the PCT's European Patent Office (the "Festuccia Patent Applications"). *Id.* ¶ 37. Throughout 2010 and 2011, NGBF received reports from various foreign patent authorities analyzing the Petrucci and Festuccia

---

2009, and, in July 2009 was promoted to Chief Operating Officer. *Id.* ¶ 9. Goebel also served as the Interim Principal Executive Officer of NGBF starting in March 2011. *Id.* Defendant Diane Saglio ("Saglio") joined NGBF as the Chief Financial Officer in March 2010 and continued to hold that position at all relevant times. *Id.* ¶ 10.

[6]     The pending patents involved technologies used to manufacture alternative biofuels from plant oils, animal fats and other oils.

Patent Applications, all of which cited deficiencies similar to those noted in the October 23, 2007 ISA Report (these reports, together with the October 23, 2007 ISA Report, are collectively referred to as the "Foreign Patent Reports").[7]  *Id.* ¶ 41.  Plaintiff alleges that the deficiencies cited in the Foreign Patent Reports were "devastating" and that the deficiencies were ultimately the reason why all of NGBF's patent applications were either withdrawn by NGBF or rejected by the USPTO.  *Id.*

### B.  Defendants' Alleged Misrepresentations and Omissions

Alpha claims that it was defrauded by three distinct types of misrepresentations and omissions.  *Id.* ¶ 22.  First, Defendants overstated the value of the Master License Agreement.  *Id.* ¶ 23.  Second, Defendants failed to disclose the negative feedback it had received in the Foreign Patent Reports and instead discussed its pending patents in positive terms.  *Id.* ¶ 24.  Third, Rosen improperly concealed his ownership and sales of NGBF stock.  *Id.* ¶ 25.

#### 1.  The Value of the Master License

In public statements signed by Defendants and filed with the Securities and Exchange Commission ("SEC") for fiscal years 2007 through 2010, Defendants represented that the value of NGBF's licenses under the Master License Agreement ranged from over $5 million to over $8 million.  *Id.* ¶¶ 23, 27.[8]  Each year, in its Form 10-K, NGBF stated that it had reviewed the value of the Master License Agreement on a periodic basis for impairment, and that its valuation was measured by the future undiscounted net cash flows expected to be generated.  *Id.*  NGBF's

---

[7]     NGBF received the following reports identifying deficiencies in its patent claims during 2010 and 2011: the European Search Report dated February 8, 2010; the Australian Patent Office Search Report dated May 11, 2010; the International Search Reports dated July 20, 2011; September 13, 2011 and September 29, 2011; and the European Patent Office International Search Report dated October 8, 2011.  *Id.* ¶ 41.

[8]     In Form 10-Ks filed with the SEC, Defendants reported that the value of the Master License Agreement to NGBF was $8,061,350 in 2007; $6,267,460 in 2008; $5,650,988 in 2009 and $5,039,545 in 2010, respectively.  *Id.* ¶ 27.

Form 10-Ks also represented that NGBF had capitalized its Master License Agreement and estimated its useful life to be 13 years. *Id.* With the exception of one write-down for approximately $1.6 million in 2008, the only other reductions in value reported in NGBF's 10-K filings represented amortization based on the Master License's estimated 13-year period of usefulness. *Id.* ¶¶ 28-29.

Alpha alleges that each of NGBF's public filings from 2007 through 2010 contained fraudulent misstatements and omissions. Instead of being worth $5 to $8 million, the intellectual property rights held under the Master License Agreement were worthless, or at least worth significantly less than the disclosed value, because the underlying patent claims had been found deficient by every governmental authority to have examined them. *Id.* ¶¶ 23, 41. NGBF's public filings also misrepresented that the Master License Agreement had been periodically assessed to ensure that the reported value reflected a fair estimate of future cash flow, when, in fact, no such assessments were made and, knowing what NGBF knew, there was no rational basis to project any future cash flow from the Master License Agreement. *Id.* ¶ 30. Although NGBF's public filings warned that the Company was having financial difficulties and that it might never realize the value of its intellectual property rights, in Plaintiff's view, these warnings were insufficient to keep NGBF's positive statements about the viability of its pending patents and the value of its rights under the Master License Agreement from misleading investors. Opp. to Rosen Mem. at 1-2, 26-27; Opp. to Mack Mem. at 4.

Alpha further alleges that Defendant Rosen made oral misrepresentations and omissions in 2008 and late in the summer of 2010 to Ari Rabinowitz, who was acting on behalf of Alpha at the time. FAC ¶¶ 31-32. Specifically, Rosen told Rabinowitz that NGBF's proprietary technologies were the subject of viable pending patent applications in the United States, the value of which was reflected in a multi-million dollar Master License Agreement. *Id.* During

5

the latter meeting, Rosen explained that even though he had formally resigned from NGBF in

2010, he was still running the Company but was focused at that time on raising additional funds

to ensure the Company's future success.  *Id.* ¶ 32.[9]  Following the meeting, Rabinowitz spoke to

Defendants Saglio and Goebel, who also failed to disclose that NGBF's patent applications had

been found deficient in multiple Foreign Patent Reports and were likely to be rejected by the

USPTO.  *Id.*

### 2.  The Viability of NGBF's Pending Patents

In SEC filings and other written statements, Defendants failed to disclose negative

feedback that they had received in the Foreign Patent Reports regarding NGBF's pending patents

and instead described the patent applications in positive terms.  *Id.* ¶¶ 24, 47.  NGBF's 2007

Form 10-K, filed on March 31, 2008, stated:

> We rely on our contractual exclusivity in North America, Central America and the
> Caribbean under our license and on a combination of know-how and trade secret rights
> and potential patent rights to establish and protect our rights in our technology.  In April
> 2006, we filed a U.S. provisional patent application on behalf of the inventor and directed
> to the technology covered by our license.  In April 2007, we filed a U.S. nonprovisional
> patent application and foreign patent applications for the technology.  Until patent
> protection is granted, we must rely on trade secret protection, which requires reasonable
> steps to preserve secrecy. . . .  In addition, trade secret protection does not provide any
> barrier to a third party "reverse engineering" fuel made with the technology, to the extent
> that the technology is readily ascertainable by proper means.  Neither the patent, if it
> issues, nor trade secret protection will preclude third parties from asserting that the
> technology, or the products we or our sub-licensees commercialize using the technology,
> infringes upon their proprietary rights.

*Id.* ¶ 34; FAC Exhibit 18 at 7.[10]

---

[9]      According to Alpha, Rosen failed to disclose that his true purpose in raising additional funds was to ensure
his own profitable exit from the Company.  *Id.*

[10]      The 2007 Form 10-K was signed by Defendants Gillespie (President and Chief Executive Officer),
Claiborne (Chief Financial Officer), Rosen (Chairman of the Board) and Mack (Director).

NGBF's 2008 and 2009 Forms 10-K,[11] which were filed on March 31, 2009, and March 26, 2010, respectively, contained substantially identical language, and further stated that, in April 2007, NGBF filed a patent application under the PCT that claimed the benefit of the United States provisional application, and in September 2008, NGBF filed national applications in the United States and certain foreign countries.  FAC ¶ 34; Ex. 19 at 9; Ex. 20 at 10.

NGBF's Form 10-K for 2010,[12] which was filed on April 15, 2011, contained similar language regarding NGBF's pending patent applications in the United States and abroad.  FAC ¶ 35.  The 2010 Form 10-K also stated that NGBF had amended its original provisional patent and continued to develop new technology due to significant improvements in its research and development efforts between 2006 and 2009.  *Id.*; Ex. 21 at 8.  In addition, NGBF's 2010 10-K included the following statements:

> We are a clean energy company deploying novel technologies to produce cleaner, renewable biofuels.  We have rights to a portfolio of patented and patent pending technology to manufacture alternative biofuels from plant oils, animal fats and related oils, which we market as a new class of biofuel for power generation, commercial and industrial heating, and related uses.

FAC ¶ 35; Ex. 21 at 1.

> We believe the patents we have filed for the glycerin and pyrolysis oil based biofuels, that are solutions instead of emulsions, are available to us for global production, sales and licensing and are not covered by our emulsion technology license agreement.  Until patent protection is granted, we must rely on trade secret protection, which requires reasonable steps to preserve secrecy.

FAC ¶ 35; Ex. 21 at 8.

> The Company believes that its proprietary biofuel can provide a lower cost, renewable alternative energy source with significantly lower emissions than traditional fuels. Through our wholly owned subsidiary . . . the Company holds an exclusive license for North America, Central America and the Caribbean to commercialize proprietary emulsion technology (the

---

[11]     The 2008 and 2009 Forms 10-K were signed by Defendants Claiborne (Chief Financial Officer), Rosen (Chairman of the Board) and Mack (Director).

[12]     The 2010 Form 10-K was signed by Defendants Goebel (Chief Operating Officer and Interim Principle Executive Officer), Saglio (Chief Financial Officer) and Mack (Director).

"Licensed Technology"), as fully described in Note 3.  The Company has two patent applications pending for solution based biofuel utilizing low alternative use feedstocks sourced from by-products of other technologies.  The Licensed Technology coupled with the new filed patents constitute the Company's technology (the "Technology"), which centers on the use of precise mixing approaches to blend oils from renewable sources with water to create renewable biofuels.

FAC ¶ 35; Ex. 21 at F-7.

On March 27, 2011, Defendant Saglio emailed a copy of NGBF's Business Plan to

Rabinowitz, who was acting on behalf of Alpha.  FAC ¶ 42.  The Business Plan stated:

In 2010, NGBF filed a provisional patent submission for a pyrolysis-based emulsion biofuel (Andrea Festuccia inventor).  *The patent process is proceeding forward with no significant issues to date nor do we anticipate any.*  In 2011, NGBF filed a second provisional patent application for a new pyrolysis oil based biofuel that is solution and not an emulsion. The patent process for this technology is just beginning but *we do not anticipate any significant issues.*

*Id.*; Ex. 30 at 8 (emphasis added).  On May 3, 2011, Saglio sent another email to Rabinowitz,

attaching a finance plan that discussed three new patent applications that had been filed by

NGBF, implying that they were material and valid.  FAC ¶ 43; Ex. 31 at 2.

On October 19, 2011, Defendant Goebel, NGBF's Chief Executive Officer, emailed

Geoff Soares, a representative of Alpha, discussing NGBF's pending patent applications in detail

but failing to disclose the significant deficiencies that had been identified in the Foreign Patent

Reports.  FAC ¶ 45.  And, on October 26, 2011, Defendant Festuccia, NGBF's Chief

Technology Officer, emailed Mr. Soares regarding NGBF's patent applications, again failing to

disclose any of the deficiencies that had been identified in the Foreign Patent Reports.  *Id.* ¶ 46.

Alpha claims that these statements were all false or misleading because they either gave

inaccurate information regarding the viability of NGBF's patents and pending patents or failed to

disclose known negative information about NGBF's patent applications that was necessary in

order to make the Defendants' statements regarding the viability of its pending patents not

misleading.  *Id.* ¶ 47.  Defendants failed to disclose that NGBF's pending patents had been, or

likely would be, rejected and also failed to account for the diminished value of its intellectual property rights and Master License Agreement as a result. *Id.* ¶¶ 45, 47.

### 3. Rosen's Stock Ownership and Sales

In SEC filings and in oral statements, Defendants misrepresented and failed to disclose an unlawful scheme through which Rosen concealed his ownership and sales of NGBF stock. *Id.* ¶ 25. Between October 2006 and May 2010, Rosen made false statements regarding his beneficial ownership and interest in NGBF shares and then failed to report transactions through which he directly or indirectly profited from the sale of such shares. *Id.* ¶¶ 48-50.[13]

### C. NGBF's Downfall

NGBF was never profitable. Over the course of the five years it was in business, the Company produced less than $220,000 in gross revenue. *Id.* ¶¶ 82-83. Meanwhile, NGBF suffered millions in losses each year. *Id.* ¶ 83. Starting in 2010, NGBF's public filings raised doubts regarding NGBF's ability to continue as a going concern, stating: "If [NGBF] cannot obtain sufficient additional financing in the short-term, it may be forced to restructure or significantly curtail its operations, file for bankruptcy or cease operations." Honig Decl., Exs. 5-9. Notwithstanding NGBF's bleak financial results, the Individual Defendants were well-compensated throughout this period, earning hundreds of thousands of dollars each year in cash and stock options. FAC ¶¶ 83, 90, 100, 104, 109, 113, 118, 123; Opp. to Mack Mem. at 23 n1.

---

[13]     Specifically, Rosen failed to disclose or falsely disclaimed beneficial ownership in approximately 3 million shares of NGBF stock in his 2006 Form 3 and Schedule 13D. FAC ¶¶ 55-57, 59-60. He also signed a Form 10-KSB in 2007 and a Form 10-K in 2008 that falsely stated that he had no ownership interest in approximately 2.6 million NGBF shares held by trusts in which he was a beneficial owner. *Id.* ¶ 58. Between June 2007 and May 2010, Rosen failed to report to the SEC a series of profitable transfers and sales of NGBF stock that were made by trusts in which Rosen had a beneficial ownership interest. *Id.* ¶ 65. On December 21, 2012, the SEC brought suit against Rosen for fraudulently evading SEC reporting requirements and violating federal securities laws. *Id.* ¶ 25; FAC Ex. 16. On December 31, 2012, Rosen stipulated to an SEC judgment requiring him to disgorge $716,484 plus civil penalties of $195,000 and enjoining him from further violations of the federal securities laws. *Id.*

Despite the disclosed "going concern" warning, Alpha decided to invest in NGBF in 2011.  Alpha insisted on, and was given, a security interest in substantially all of NGBF's assets, including its contract rights, license rights and intellectual property rights.  FAC ¶ 20.  Alpha completed its investments in NGBF in October 2011, and, by December 28, 2011, all of NGBF's patent applications had either been withdrawn or rejected by the USPTO.  *Id.* ¶¶ 127, 138, 149, 182.  Shortly after Alpha's last investment, the Company ceased operations, its stock stopped trading and the value of its shares dropped to $0.00.  *Id.* ¶ 89.  Alpha tried but failed to collect the investments it had made in NGBF.  *Id.* ¶¶ 19-20.  The collateral upon which Alpha's investment had been secured turned out to be valueless, as all of NGBF's patent applications under the Master License Agreement were ultimately rejected.  *Id.* ¶ 41.

## II.    DISCUSSION

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief."  *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)).  "Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).  "[T]o survive a motion under Rule 12(b)(6), a complaint does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level."  *Keiler v. Harlequin Enters.,* Ltd., 751 F.3d 64, 70 (2d Cir. 2014) (citation omitted).

Because claims under Section 10(b) of the Securities Exchange Act sound in fraud, they are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §

78u–4(b).  Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2); *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).  Under this heightened pleading standard, a "complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

In deciding a motion to dismiss, courts should generally not consider materials extrinsic to the complaint.  Fed. R. Civ. P. 12(d).  This rule is subject to several exceptions, however, including that a court may consider documents incorporated by reference into the complaint. *ATSI Commc'ns, Inc.*, 493 F.3d at 98.  A court may also consider documents upon which the complaint "relies heavily," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002), as well as extrinsic materials that the plaintiff knew of or possessed and relied upon in framing the complaint.  *Laporte v. Fisher*, No. 11 CIV. 9458 (PKC) (HBP), 2012 WL 5278543, at *2 (S.D.N.Y. Oct. 24, 2012) (citing *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993)).  Finally, the Court may take judicial notice of public disclosure documents that must be filed with the SEC and documents that both "bear on the adequacy" of SEC disclosures and are "public disclosure documents required by law."  *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 570 (S.D.N.Y. 2013) (quoting *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773–74 (2d Cir. 1991)).

11

A. **Personal Jurisdiction over Defendant Festuccia**

Defendant Festuccia, an Italian resident who never signed any of the relevant SEC filings, asserts that the Court lacks personal jurisdiction over him.  On a motion pursuant to Fed. R. Civ. P. 12(b)(2), the plaintiff bears the burden of making a *prima facie* showing that jurisdiction exists, *see Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007), and all facts are viewed in the light most favorable to the plaintiff.  *Alki Partners, L.P. v. Vatas Holding GmbH*, 769 F. Supp. 2d 478, 487-88 (S.D.N.Y. 2011), *aff'd sub nom. Alki Partners, L.P. v. Windhorst*, 472 F. App'x 7 (2d Cir. 2012) (citation omitted).  "[A] prima facie showing of jurisdiction does not mean that plaintiff must show only some evidence that defendant is subject to jurisdiction; it means that plaintiff must plead facts which, if true, are sufficient in themselves to establish jurisdiction."  *Bellepointe, Inc. v. Kohl's Dep't Stores, Inc.*, 975 F. Supp. 562, 564 (S.D.N.Y. 1997).  Personal jurisdiction may be either (1) general, where the defendant's contacts with the forum have been continuous and systematic or (2) specific, where the defendant has purposefully directed his activities toward the forum and the litigation arises out of or is related to his contact with the forum.  *Alki Partners, L.P.*, 769 F. Supp. 2d at 488 (citing *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 466–67 (S.D.N.Y 2008)).

Plaintiff's claims are based on the Exchange Act, which provides for worldwide service of process and permits the exercise of personal jurisdiction to the limit of the Fifth Amendment's Due Process Clause.  *Alki Partners, L.P.*, 769 F. Supp. 2d at 487 (citing 15 U.S.C. § 78aa; *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990)).  *See also SEC v. Softpoint Inc.*, No. 95 Civ. 2951 (GEL), 2001 WL 43611, at *5 (S.D.N.Y. Jan. 18, 2001) ("[t]he constitutionality of *in personam* jurisdiction in federal question cases where Congress has provided for worldwide service is to be determined by national, rather than local, contacts.").  Because Festuccia has not objected to service, his 12(b)(2) motion fails unless an exercise of jurisdiction over him would

violate due process.  *Alki Partners, L.P.*, 769 F. Supp. 2d at 488 (citing *U.S. Titan, Inc. v.*

*Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 152 n.12 (2d Cir. 2001)).  *See also Donoghue*

*v. Dicut, Inc.*, 01 CIV. 10194 (NRB), 2002 WL 1728539, at *2 (S.D.N.Y. July 24, 2002).

      For personal jurisdiction to comport with due process, Plaintiff must establish that

Festuccia "purposefully availed himself of the privilege of doing business in the forum state and

that the defendant could foresee being haled into court there."  *SEC v. Straub*, 921 F. Supp. 2d

244, 253 (S.D.N.Y. 2013) (citing *Kernan v. Kurz–Hastings, Inc.*, 175 F.3d 236, 242–43 (2d Cir.

1999)).  Using that standard, Plaintiff has met its burden of proving a *prima facie* case of

jurisdiction sufficient to withstand challenge at this early stage of the litigation.  Although

Festuccia is a resident of Italy, he is also the inventor of much of NGBF's intellectual property.

As the Company's Chief Technology Officer, he signed and approved all of NGBF's patent

applications (including those submitted in the United States), approved valuations of the Master

License Agreement that were the basis of values disclosed in NGBF's financial statements and

SEC filings, and corresponded with one of Alpha's representatives regarding the pending

patents.  FAC ¶¶ 37, 46, 94, 98.  In doing so as the officer of a publicly-traded United States

company that was required to make filings with the SEC throughout the relevant period,

Festuccia purposefully availed himself to the forum such that he could foresee being haled into

court here.  *Id.* ¶¶ 3, 20, 41.  *See also Donoghue*, 2002 WL 1728539, at *2; *Landry v. Price*

*Waterhouse Chartered Accountants,* 715 F. Supp. 98, 101 (S.D.N.Y. 1989) (personal jurisdiction

existed over foreign director of corporation who knew or should have known that financial

statements he approved would affect price share on the NASDAQ); *Reingold v. Deloitte Haskins*

*& Sells,* 599 F. Supp. 1241, 1259-60 (S.D.N.Y. 1984) (personal jurisdiction existed over an

Australian accounting firm that prepared an audit knowing it would be included in a United

States securities filing); *Itoba Ltd. v. LEP Grp. PLC*, 930 F. Supp. 36, 41 (D. Conn. 1996)

(personal jurisdiction existed over foreign director whose company's securities traded on the

NASDAQ and who knew or should have known that the Form 20–F he approved would be filed

with the SEC and relied on by potential investors).

Although Festuccia did not sign the public filings at issue, given his role as the head of

NGBF's technology division, the inventor of much of the relevant intellectual property, and the

person who oversaw and signed NGBF's patent applications, Plaintiff has adequately alleged

that Festuccia was aware of and responsible for NGBF's statements regarding the viability of its

patents, and therefore could expect to face litigation regarding such statements.[14]  FAC ¶ 98.  *Cf.*

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp*., 875 F. Supp. 2d 359, 374-

75 (S.D.N.Y. 2012) (finding the executive in charge of the division whose misconduct was at the

heart of plaintiff's claims and who was informed of overstated projections to be a "maker" of the

company's public statements even though she did not sign them).  Accordingly, Festuccia's

motion to dismiss for lack of personal jurisdiction is denied.

B.  **Section 10(b) Claims**

Section 10(b) and Rule 10b–5 make it "unlawful for any person ... [t]o make any untrue

statement of a material fact or to omit to state a material fact necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading."

17 C.F.R. § 240.10b–5(b).  To state a claim under Section 10(b) and Rule 10b–5, Plaintiff must

allege that "in connection with the purchase or sale of securities, the defendant[s] made material

misstatements or omissions of material fact, with scienter, and that the plaintiff's reliance on the

---

[14]     As the Chief Technology Officer, Festuccia is also subject to Section 303 of the Sarbanes Oxley Act and
related federal regulations which prohibit officers from making misleading statements or omitting material facts in
statements made to accountants in the course of preparing an audit, or in preparing or filing any materials as
required by the SEC.  17 C.F.R. § 240.13b2–2; 15 U.S.C. § 7242.

defendant[s'] actions caused injury to the plaintiff." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 765 (2d Cir. 2010) (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000)).

Plaintiff alleges fraud in connection with two bundles of disclosures and omissions: (1) NGBF's statements regarding its pending patents and the related value of its intellectual property rights under the Master License Agreement,[15] and (2) Rosen's failure to disclose his NGBF stockholdings and sales. Because the Complaint fails to allege any facts showing that the Non-Rosen Defendants had any knowledge of, or involvement in, Rosen's stock ownership, and because there is otherwise little, if any, overlap between the two sets of alleged misrepresentations and omissions, the Court will discuss them separately.

### 1. Alleged Misstatements and Omissions Regarding NGBF's Pending Patents and Master License Agreement Are Adequately Alleged

#### a. Plaintiff Has Sufficiently Alleged the Elements of its Section 10(b) Claim

Plaintiff's 10(b) claims regarding the prospects of NGBF's pending patents and the value of its Master License Agreement rest on a series of fact-intensive inquiries surrounding the availability, interpretability, and significance of the Foreign Patent Reports. Plaintiff argues that the Foreign Patent Reports were neither functionally accessible nor readily understood but were predictive of, and therefore significant to, the future prospects of NGBF's pending patents and the value of the Master License Agreement. In Plaintiff's view, the Foreign Patent Reports exposed highly problematic or incurable deficiencies in NGBF's inventions, and the failure to disclose such deficiencies made NGBF's optimistic statements false and misleading. FAC ¶ 41.

---

[15]     In addition to alleging that Defendants made fraudulent statements with respect to NGBF's pending patents, Plaintiff argues, for the first time in its opposition brief, that NGBF never owned *any* patents, and therefore public statements regarding NGBF's portfolio of "patented and patent pending" technology also constituted misstatements. Opp. to Mack Mem. at 3-4, 16. In response, Defendants counter that NGBF owned several patents that were issued in the Republic of South Africa and the Republic of Liberia. Because the Court cannot consider allegations raised for the first time in Plaintiff's opposition brief, *see Kiryas Joel Alliance v. Vill. of Kiryas Joel*, No. 11 CIV. 3982 (JSR), 2011 WL 5995075, at *5 (S.D.N.Y. Nov. 29, 2011), *aff'd*, 495 F. App'x 183 (2d Cir. 2012), the Court need not address the question of fact as to the existence of Defendants' patented technology.

Defendants see the world differently.  They argue that all but two of the Foreign Patent Reports were readily available to Alpha through searchable online databases and other internet sites.  Mack Mem. at 4, 7 n.5, 9, 21; Rosen Mem. at 12.  Moreover, Defendants argue that the Foreign Patent Reports were not "devastating" or even particularly significant to the ultimate success or failure of NGBF's pending patents; they were simply a routine, benign and non-binding part of the patent prosecution process.  Mack Mem. at 23.  As such, Defendants were not required to disclose negative information from the Foreign Patent Reports in order to keep NGBF's public filings regarding its pending patents from being false or misleading.  *Id.* at 15-16. Nor were they required to record any additional write-downs to adjust for a loss of value in the intellectual property rights held under the Master License Agreement.  *Id.*

The discrepancy between the two parties' interpretation of the facts, each of which is buttressed by a lengthy patent law expert declaration, cannot be resolved on a motion to dismiss. Discovery is necessary to resolve several fundamental questions underlying the parties' opposing views, including: (1) how accessible were the Foreign Patent Reports? (2) how intelligible were the Foreign Patent Reports to a reasonable, or even a sophisticated, investor? (3) what was the significance of the Foreign Patent Reports with respect to NGBF's patent applications pending in jurisdictions covered under the Master License Agreement, including the United States?

Defendants' argument that they had no duty to disclose information regarding the Foreign Patent Reports simply because the reports were accessible through the internet is an oversimplification of the law.[16]  Mack Mem. at 15.  While it is true that "there is no duty to

---

[16]     Cases cited in support of Defendants' position involve disclosures that appear to be more obviously accessible than the relatively obscure disclosures at issue here.  In *White v. Melton*, 757 F. Supp. 267, 272 (S.D.N.Y. 1991), for example, the court held that materials incorporated by reference into a mutual fund prospectus had been appropriately disclosed and therefore dismissed securities fraud claims premised on alleged misstatements or omissions contained therein.  *See also In re KeySpan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 376-77 (E.D.N.Y. 2003) (finding disclosures to be "readily accessible in the public domain" when relevant information appeared in

disclose information to one who reasonably should be aware of it," *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978) (quotation omitted), "case law does not support the sweeping proposition that an issuer of securities is never required to disclose publicly available information." *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 127 (2d Cir. 2013) (quoting *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718 (2d Cir. 2011)).[17]

The determination of whether Defendants made material misstatements or omissions with respect to NGBF's pending patents and Master License Agreement thus revolves around the related questions of (1) whether Plaintiff reasonably should have been aware of the Foreign Patent Reports and (2) the extent to which Defendants were required to disclose information regarding the Foreign Patent Reports, or the deficiencies identified therein, in order to prevent

---

two of company's publicly-filed documents); *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d at 576 (finding no omissions where the allegedly concealed information had been reported in major news outlets including The New York Times, The Wall Street Journal and others); *In re AOL, Inc. Repurchase Offer Litig.*, 966 F. Supp. 2d 307, 313 (S.D.N.Y. 2013) (allegedly concealed information was "well known," "prominently discussed in the press" and disclosed by the company); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 250-51 (S.D.N.Y. 2003) (allegedly concealed information had been recorded in public filings and reported in media sources such as The Wall Street Journal, Financial Post, The Boston Globe, Business Week and The Economist).

Similarly, Defendants' reliance on *In re Authentidate Holding Corp.*, No. 05 CIV. 5323 (LTS), 2006 WL 2034644, at *3 (S.D.N.Y. July 4, 2006), is misplaced.  Mack Mem. at 13; Mack Reply at 6.  In that case, the USPTO had publicly filed notices that the relevant patents had been rejected, SEC filings warned investors that the company had no patents and that there was a chance that patent infringement had already occurred or might occur, and the plaintiffs had conceded that any claims regarding the non-disclosure of the USPTO's rejection notices were therefore time-barred. *Id.*  Here, in contrast, the Foreign Patent Reports may not have been binding rejections, the relevant SEC filings provided no warnings that the pending patents had been found to be deficient, and Plaintiff has adequately argued that a reasonable investor might not have located or understood the significance of such reports.

[17]   *See also Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 213, 215 (5th Cir. 2004) (noting that "the SEC requires an issuer to disclose certain 'trends' that could affect its business, and in appropriate circumstances this requirement may extend to certain trends that are not firm-specific or are publicly available"); *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993) (stating that "the mere presence in the media of sporadic news reports . . . should not be considered to be part of the total mix of information that would clarify or place in proper context the company's representations in its proxy materials"); *Kronfeld v. Trans World Airlines, Inc.*, 832 F.2d 726, 736 (2d Cir. 1987) ("There are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a ... prospectus on the basis that the information is public knowledge and otherwise available to them."), *cert. denied,* 485 U.S. 1007 (1988).

statements made regarding NGBF's pending patents from being false or misleading.[18]  These issues cannot be resolved as a matter of law at this stage of the litigation.

As to scienter, the Court finds that Plaintiff has alleged sufficient facts that, if viewed in the light most favorable to Plaintiff, establish (1) Defendants' motive and opportunity to commit fraud or (2) evidence of conscious recklessness.  *See South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 108–09 (2d Cir. 2009).  To demonstrate motive and opportunity to defraud, Plaintiff must allege that Defendants "benefited in some concrete and personal way from the purported fraud."  *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (quotation omitted).  To establish conscious recklessness, Plaintiff must establish a "state of mind approximating actual intent," which shows "at the least . . . an extreme departure from the standards of ordinary care . . . ."  *Novak*, 216 F.3d at 308, 312.  The Second Circuit has further clarified that scienter may be demonstrated by proof that defendants "knew facts or had access to information suggesting that their public statements were not accurate; or [] failed to check information they had a duty to monitor."  *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 298 (S.D.N.Y. 2009) (citing *ECA*, 553 F.3d at 199).

---

[18]    Rosen also argues that Plaintiff's 10(b) claims against him should be dismissed because he was not a "maker" of any alleged misstatements after he stepped down from his role as Chairman of the Board in May 2010. Rosen Mem. at 21.  In Rosen's view, the only conceivably actionable misstatements are those made in late 2010 and 2011, immediately before or during the period in which Alpha invested, which Rosen did not sign or make in his official capacity as Chairman of the Board.  *Id.*  The only case Rosen offers in support of this argument, *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2302 (2011), states merely that "the maker of a statement is the person or entity with ultimate authority over the statement" as opposed to someone who prepares or publishes a statement on behalf of others.  Rosen offers no justification — from *Janus* or elsewhere — for the startling argument that a director or officer can escape liability for fraudulent statements that otherwise satisfy the elements of a Section 10(b) claim by resigning from their official role before a plaintiff invests in reliance on such previously-made fraudulent statements.  *Cf. In re Omnicom Grp., Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 553 (S.D.N.Y. 2008), *aff'd*, 597 F.3d 501 (2d Cir. 2010) (a director's resignation does not constitute a corrective disclosure when the resignation is not connected to the alleged fraud).

Rosen's fraudulent concealment of his stock sales supports an inference of scienter because it tends to demonstrate that he had a motive and an opportunity to defraud Alpha (Alpha's additional investments permitted Rosen to sell his hidden stockholdings before NGBF stock ceased trading). FAC ¶¶ 84, 87, 89, 91. *See Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) (scienter satisfied where CEO made misleading statements in order to manipulate the price of the company's stock so he could sell his shares at inflated prices). Plaintiff has also established scienter as to the other Individual Defendants, who had access to information in the Foreign Patent Reports suggesting that the Company's public statements were not accurate, or who failed to verify information that they had a duty to monitor. FAC ¶ 19. *See NovaGold*, 629 F. Supp. 2d at 298 (citation omitted). *See also Novak*, 216 F.3d at 308 ("An egregious refusal to see the obvious, or to investigate the doubtful" may also comprise reckless behavior) (citation omitted)). On the other hand, Plaintiff's allegations regarding the Non-Rosen Defendants' facilitation of Rosen's fraudulently concealed stock sales and sales of their own NGBF stock on the public market are unsupported and therefore unavailing.[19]

With respect to reliance, Defendants argue that Alpha cannot establish justifiable reliance because (1) certain misstatements and omissions complained of were made *after* Alpha had completed its 2011 investments, *see* Rosen Mem. at 18; (2) the Foreign Patent Reports were readily available to a sophisticated investor such as Alpha, Mack Mem. at 21; (3) the relevant SEC filings warned that NGBF's pending patents might never succeed, thereby establishing a defense under the "bespeaks caution" doctrine, Rosen Mem. at 18; and (4) the relevant

---

[19]     As Defendants note, Plaintiff has failed to allege that any of the Non-Rosen Defendants actually sold or profited from the sale of NGBF stock, and public filings show that some of the Non-Rosen Defendants actually increased their share holdings during the relevant period. *See* Mack Mem. at 17-18. In addition, Plaintiffs fail to allege with specificity any facts suggesting that the Non-Rosen Defendants knew of or facilitated Rosen's concealed stock sales.

subscription agreements contained a merger clause excluding reliance on any oral representations made prior to the Alpha's investments. *Id.* at 18.  The Court agrees that Plaintiff has failed to allege reasonable reliance with respect to statements made after Alpha's final investment on October 12, 2011.[20]  In addition, Plaintiff has failed to plead reasonable reliance on oral statements that Rosen allegedly made to Rabinowitz in 2008; the FAC alleges that Alpha relied on those statements in making its 2008, 2009 and 2010 investments but not in making the 2011 investments that are at issue in this case.  FAC ¶ 31.

Putting aside Rosen's 2008 statements to Rabinowitz and statements made after Alpha's last investment in 2011, the Court finds that Plaintiff has adequately pled reasonable reliance.  In light of the unresolved questions regarding the accessibility, interpretability and significance of the Foreign Patent Reports, as discussed above, the public nature of the Foreign Patent Reports is not, by itself, determinative of reasonable reliance.  To the extent that Alpha is held to the higher standard of a "sophisticated investor," *see, e.g., In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 439 (S.D.N.Y. 2001), its enhanced duty to obtain material information about its investments may be "limited to situations where 'basic inquiries would have revealed the truth,' or where the plaintiff was 'practically faced with the facts when entering a transaction.'" *Maverick Fund, L.D.C. v. Comverse Tech., Inc.*, 801 F. Supp. 2d 41, 57 (E.D.N.Y. 2011) (citation omitted).  Because of the fact-intensive nature of this inquiry, the Court cannot resolve this issue on a motion to dismiss.  *See Sawabeh Info. Servs. Co. v. Brody*, 832 F. Supp. 2d 280, 305 (S.D.N.Y. 2011) (citing *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997)).

---

[20]     This includes statements made in NGBF's final Form 8-K and emails allegedly sent by Defendants Goebel and Festuccia to Alpha representatives on October 19, 2011, and October 26, 2011, respectively. FAC ¶¶ 14, 41, 44-46.

In addition, the "bespeaks caution" doctrine on which Defendants rely applies only to forward-looking, prospective representations; cautionary language cannot be used to cure the alleged misrepresentations of present or historical facts at issue here. *See P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004). Although NGFB's filings did contain cautionary language, including statements that the Company might not be able to protect its intellectual property rights, Honig Decl. Ex. 5 at 30, Ex. 6 at 35, and that there was no guarantee that it would receive patent protection, FAC Ex. 20 at 379, these general statements may not have been adequate to counter or contextualize other optimistic statements because they failed to reflect the negative findings from the Foreign Patent Reports.

As for the merger clause in Alpha's subscription agreements, courts in this Circuit have generally only barred reliance on oral statements made prior to the execution of an integrated agreement where the merger clause was the product of counseled negotiations between the parties. *See Anglo-German Progressive Fund, Ltd. v. Concorde Grp., Inc*., 09 CIV 8708 (PKC), 2010 WL 3911490, *9 (S.D.N.Y. Sept. 14, 2010) (citing *ATSI Commc'ns, Inc.*, 493 F.3d at 105). *See also Emergent Capital Inv. Mgmt. v. Stonepath Group, Inc.*, 343 F.3d 189, 196 (2d Cir. 2003); *Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476, 491–93 (S.D.N.Y. 2005). In addition, questions of fact remain as to whether Rosen was an intended beneficiary, or otherwise was acting as a corporate agent of NGBF with respect to his 2010 oral statements to Rabinowitz, so as to have standing to invoke the merger clause. *See e.g., Premium Mortgage Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009); *Katz v. Image Innovations Holdings, Inc.*, No. 06 CIV 3707 (JGK), 2008 WL 4840880, at *7 (S.D.N.Y. Nov. 4, 2008); *In re WorldCom, Inc.*, 374 B.R. 94, 108-09 (Bankr. S.D.N.Y. 2007). Such questions cannot be resolved in Rosen's favor at this early pleading stage, and the Court finds that Alpha has otherwise adequately pled reliance.

Plaintiff has also met its burden in pleading loss causation.  Plaintiff alleges that it

suffered losses on its investments in NGBF because the Master License Agreement and

intellectual property rights that Defendants had represented as being valuable and viable turned

out to be valueless and materially deficient.  FAC ¶ 19.  When NGBF ceased operating, Plaintiff

was unable to collect on its investments or receive any benefit from its collateral.  *Id.*  Such

allegations are sufficient to establish that "the *subject* of the fraudulent statement or omission

was the cause of the actual loss suffered," i.e., that the undisclosed deficiencies in NGBF's

pending patents were a significant cause of NGBF's lack of profitability and eventual collapse,

and the reason that Plaintiff's security interest was worthless.[21]  *Amorosa v. AOL Time Warner

Inc.*, 409 F. App'x 412, 415-16 (2d Cir. 2011).  *See also In re Initial Pub. Offering Sec. Litig.*,

544 F. Supp. 2d 277, 299 (S.D.N.Y. 2008).

### b.  Plaintiff's 10(b) Claims are Not Time-Barred Except as to Gillespie

Defendants' argument that Plaintiff's 10(b) claims are time-barred is unavailing with

respect to all Defendants except for Gillespie.  Securities fraud claims brought under Section

10(b) are subject to a two-year statute of limitations and a five-year statute of repose.  28 U.S.C.

§ 1658(b).  The two-year limitations period is triggered when a plaintiff actually discovers, or

when a reasonably diligent plaintiff should have discovered, facts constituting a violation of

Section 10(b).  *Merck & Co. v. Reynolds*, 559 U.S. 633, 644 (2010); *In re Authentidate Holding

Corp.,* 05CIV5323 (LTS), 2006 WL 2034644, at *2 (S.D.N.Y. July 14, 2006) ("Plaintiffs will be

deemed to have discovered fraud for statute of limitations purposes when a reasonable investor

---

[21]      Rosen argues that loss causation cannot be established because Alpha's losses are solely attributable to "intervening events," namely NGBF's running out of liquidity and ceasing operations.  Rosen Mem. at 19.  Reading the facts in the light most favorable to Plaintiff, however, Plaintiff has plausibly argued that NGBF's liquidity crisis was caused by the failure of its patent applications, and that Defendants' misstatements and omissions regarding the viability such patent applications ultimately led to Alpha's losses.  In any event, this presents a factual question that is not ripe for resolution at the pleading stage.

of ordinary intelligence would have discovered its existence") (citing *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993)).  The statute of repose runs from the time the allegedly fraudulent misrepresentations were actually made and is not subject to equitable tolling.  *See In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 939 F. Supp. 2d 360, 378 (S.D.N.Y. 2013) (citing *P. Stolz Family P'ship L.P.*, 355 F.3d at 102–103 (2d Cir. 2004)).  *Accord City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.,* 637 F.3d 169, 175 (2d Cir. 2011).

Defendants contend that Plaintiff's 10(b) claims are substantially barred because all but two of the allegedly concealed Foreign Search Reports were publicly available to a reasonable investor via the internet more than two years before Plaintiff filed the Complaint on August 9, 2013.  Mack Mem. at 13-14.  Viewing the facts in the light most favorable to Plaintiff, the Court finds that Alpha has adequately alleged that it did not have actual knowledge of the alleged misstatements and omissions and that a reasonable investor may not have discovered the alleged misstatements and omissions until after Alpha made its final investment in NGBF in October 2011, less than two years before the filing of the Complaint.

The statute of repose, however, requires all allegations that are based solely on misrepresentations or omissions contained in the 2007 Form 10K, which was filed more than five years prior to the filing of the Complaint, to be stricken.  Because the only alleged misrepresentations or omissions attributable to Gillespie were contained in the 2007 Form 10K, Plaintiff's 10(b) claims against Gillespie are dismissed.  Plaintiffs 10(b) claims against the other Defendants remain because the FAC contains allegations that each is responsible for misstatements or omissions allegedly made within the five-year period preceding the filing of the Complaint.

### c. **Plaintiff Has Adequately Alleged a Domestic Transaction Under** *Morrison*

Finally, Rosen argues that Plaintiff's 10(b) claims should be dismissed for failure to allege a "domestic transaction" pursuant to the Supreme Court's decision in *Morrison v. National Australia Bank Ltd.,* 561 U.S. 247 (2010).  *See* Rosen Mem. at 21-22.  Interpreting *Morrison,* the Second Circuit has held that a securities transaction is domestic "when the parties incur irrevocable liability to carry out the transaction within the United States or when title is passed within the United States."  *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 68-69 (2d Cir. 2012).

The FAC asserts that NGBF, a Florida company located in Texas and Maryland, "incurred irrevocable liability to issue and deliver the securities sold to Plaintiff . . . within the borders of the United States."  FAC ¶12.  Moreover, it appears that the relevant subscription and security agreements were executed by Saglio and Goebel in the United States.  FAC Exs. 1-15. Whether Plaintiff can ultimately prove that Defendants, in fact, incurred irrevocable liability inside the United States to deliver the securities to Plaintiff, Plaintiff has sufficiently alleged a domestic transaction to survive a motion to dismiss.  FAC ¶¶ 14-21.

### 2. **Plaintiff Fails to State a Claim as to Alleged Misstatements and Omissions Regarding Rosen's Concealed Stockholdings and Sales**

Plaintiff's 10(b) claims based on Rosen's misstatements and omissions regarding his ownership, interest in and sales of NGBF stock are dismissed for failure to adequately allege loss causation.  In pleading its 10(b) claim, Plaintiff is required to demonstrate that its "reliance on the defendant[s'] actions *caused injury to the plaintiff*."  *Slayton*, 604 F.3d at 765 (citation omitted) (emphasis added).  To establish loss causation, a plaintiff must allege (1) that the loss was foreseeable, i.e., that the risk that caused the loss "was within the zone of risk *concealed* by the misrepresentations and omissions alleged by the disappointed investor" and (2) that the loss

was caused by the materialization of the concealed risk. *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40 (2d Cir. 2009) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)) (emphasis in original).

Loss causation exists when "the misstatements were the reason the transaction turned out to be a losing one." *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 769 (2d Cir. 1994). *See also Emergent Capital Inv. Mgmt.*, 343 F.3d at 197 (2d Cir. 2003) (loss causation satisfied where the plaintiffs "specifically asserted a causal connection between the concealed information . . . and the ultimate failure of the venture"). In contrast, loss causation does not exist when the connection between the content of the alleged misstatements and the harm suffered is attenuated. *Lentell*, 396 F.3d at 174 (citing *Citibank, N.A. v. K-H Corp.*, 968 F.2d 1489, 1494-96 (2d Cir. 1992); *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir. 2001)). Put differently, the loss-causation requirement cabins a person's responsibility, even for fraudulent acts. *Castellano*, 257 F.3d at 186 (quotation omitted).

Here, Plaintiff alleges that it relied on its security interest in NGBF's assets when deciding to invest. FAC ¶¶ 1, 20. In addition, Plaintiff alleges that it "implicitly" relied on NGBF's officers and directors having complied with federal securities laws in making public disclosures regarding their stock ownership and sales. *Id.* ¶ 1. The facts pled in support of Plaintiff's loss causation theory, however, rely *solely* on its inability to collect on its investments or collateral due to the withdrawal or rejection of all of NGBF's pending patent applications. *Id.* ¶ 19. In contrast, Plaintiff asserts no facts establishing that Rosen's concealed stock ownership and sales caused Alpha to incur investment losses.[22] Plaintiff's allegations that Rosen relied on

---

[22] The Court suspects that Alpha's real complaint is that it would have never invested in a company whose founder and Chairman was in the process of secretly liquidating his ownership interest in the company. That argument, although sympathetic, does not establish loss causation under established precedent. *See Lentell*, 396

Alpha's 2011 investments in order to liquidate his remaining NGBF stockholdings may be true, but even if true, that does not demonstrate that Rosen's hidden stock holdings and sales *caused* Alpha to incur an investment loss, *Slayton*, 604 F.3d at 765, or that Rosen's concealed stockholdings and sales were "the cause of the actual loss suffered." *Lentell*, 396 F.3d at 173. Regardless of whether such transactions were fraudulent, Plaintiff has not alleged that they actually caused Alpha's losses; accordingly, Plaintiff's 10(b) claims based on Rosen's concealed stockholdings and sales are dismissed.[23]

## C. **Section 20(a) Claims**

Plaintiff has adequately alleged claims under Section 20(a) of the Exchange Act against the Individual Defendants. To establish a *prima facie* case of control person liability, a plaintiff must show: (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud. *ATSI Commc'ns, Inc.*, 493 F.3d at 108 (citation omitted). Because Plaintiff has adequately pled a Section 10(b) claim as to NGBF, the primary violation element is sufficiently pled. *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 415 (S.D.N.Y. 2003). In addition, Plaintiff's allegations that the Individual Defendants held positions as senior executives or board members who exercised control over, and in most cases were signatories to, the public SEC filings on which Plaintiff relied in investing in NGBF, *see* FAC ¶¶ 4-5, 88, 102, 107, 111, 116 and 121, are sufficient to establish control of the primary violator. *See In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 401 (S.D.N.Y. 2007).

---

F.3d at 172 (distinguishing between transactional causation, which establishes that "but for the claimed misrepresentations or omissions," plaintiff would not have entered into the relevant transaction, and loss causation, which is the "causal link" between the alleged misconduct and the harm suffered).

[23]      For the reasons discussed in Section II(B)(1)(a), *supra*, those actions are, however, relevant to Alpha's other fraud claims and are, therefore, fair targets for discovery.

While there is a split among district courts in this Circuit as to whether "culpable participation" is an element that must be pled with the same particularity as scienter, *see Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 13 CIV. 1094 (ER), 2014 WL 3605540, at *24-25 (S.D.N.Y. July 21, 2014), because the Court finds that Plaintiff has adequately pled scienter, it need not weigh in on this issue in order to find that Plaintiff's Section 20(a) claim is adequately pled with respect to the Individual Defendants.  Because, however, Plaintiff has not alleged that NGBF is liable as a control person, Plaintiff's Section 20(a) claim against NGBF is dismissed.

###### D.  **Section 18 Claims**

Plaintiff's claims under Section 18 of the Exchange Act are dismissed as being time-barred or failing adequately to plead loss causation.  To state a claim under Section 18, a plaintiff must plead that (1) the defendant "made or caused to be made" a false or misleading statement, (2) upon which the plaintiff *actually* relied, (3) resulting in loss to the plaintiff.  *Special Situations Fund III QP, L.P.*, 2014 WL 3605540, at *26 (citing *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 478 (S.D.N.Y. 2005)).  *See also* 15 U.S.C. § 78r(a).  Claims brought under Section 18 are subject to a one-year limitations period that begins when "plaintiff is put on either actual notice or constructive notice, also known as inquiry notice, of the facts giving rise to his claim," *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d at 421, and a three-year statute of repose.  *In re Bear Stearns Companies, Inc. Sec., Derivative, & ERISA Litig.*, 995 F. Supp. 2d 291, 307 (S.D.N.Y. 2014).  *See also* 15 U.S.C. § 78r(c).

Plaintiff argues that there is a "split of authority" over whether Section 18 claims are governed by the two-year period under 28 U.S.C. §1658(b) or the one-year period under 15 U.S.C. §78r.  Opp. to Mack Mem. at 28 (citing *In re Adelphia Communications Corp. Sec. and Derivative Litig.,* No. 03 MD 1529, 2005 WL 1679540, at *4 (S.D.N.Y. July 18, 2005)).

Because Section 1658(b) applies only to actions "involv[ing] a claim of fraud, deceit, manipulation, or contrivance," 28 U.S.C. § 1658(b), and, as Plaintiff acknowledges, Section 18 claims do not sound in fraud, the two-year limitations period prescribed by Section 1658(b) does not apply to Section 18 claims. *In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 641-42 (S.D.N.Y. 2008) (citing *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d at 420).

Here, Plaintiff alleges (1) that the Defendants made or caused to be made false or materially misleading statements in NGBF's public filings regarding the value of NGBF's Master License Agreement, the viability of NGBF's pending patents, and Rosen's concealed stockholdings and sales; (2) that Plaintiff relied on such false or misleading statements, and (3) that Plaintiff suffered losses as a result of the false or misleading statements. FAC ¶¶ 180-84. Plaintiff alleges that it did not discover Defendants' misstatements regarding NGBF's Master License Agreement and pending patents until shortly after Alpha stopped investing new funds into NGBF in October 2011, when NGBF ceased operations, FAC ¶ 89, Opp. to Mack Mem. at 28, and "Alpha was not repaid and the collateral failed," Opp. to Mack Mem. at 4. Alpha further alleges that by December 28, 2011, all of NGBF's pending patent applications had been withdrawn or rejected by the USPTO. FAC ¶¶ 41, 127. These assertions establish that by the end of 2011, Alpha had either actual or constructive notice of the facts giving rise to its claim.

Because Alpha did not file its complaint until more than a year after receiving such notice, its Section 18 claims arising from misstatements or omissions regarding NGBF's Master License Agreement and pending patents are time-barred.

As to the Section 18 claims based on Rosen's undisclosed stock ownership and sales, Plaintiff alleges it did not discover the truth until after the SEC filed its complaint against Rosen in December 2012. For the reasons discussed in Section II(B)(2), *supra*, however, Plaintiff has not alleged the necessary element of loss causation based on those statements or omissions.

E. **Common Law Fraud Claims**

NGBF is a Florida company operating in Maryland and Texas, but the parties have

argued Plaintiff's state law claims, including its claim for common law fraud, under New York

law.  In addition, the subscription agreements under which Plaintiff made its investments are

governed by New York law.  Where the parties agree to the applicability of a particular

jurisdiction's substantive law and there are sufficient contacts with that jurisdiction, the court

will treat such agreement as implied consent to that jurisdiction's substantive law.  *See MIG, Inc.*

v. *Paul, Weiss, Rifkind, Wharton & Garrison LLP,* 701 F. Supp. 2d 518, 532 (S.D.N.Y. 2010);

*RSL Commc'ns PLC ex rel. Jervis v. Bildirici*, No. 04-CV-5217 (KMK), 2006 WL 2689869, at

\*4 (S.D.N.Y. Sept. 14, 2006) ("Where the parties do not address the issue of what law to apply,

but instead rely on a state's law in their briefs, the court may apply state law under a principle of

implied consent").  Therefore, the Court will apply New York law to Plaintiff's state law claims.

To plead fraud under New York law, a plaintiff must allege: (1) the defendant made a

material misrepresentation; (2) with intent to defraud the plaintiff; (3) the plaintiff reasonably

relied upon the representation; and (4) suffered damage as a result.  *See Eternity Global Master*

*Fund, Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 186-87 (2d Cir. 2004).  Because

claims for common law fraud and fraud under Section 10(b) contain "essentially the same"

elements, *In re Tremont Sec. Law, State Law & Ins. Litig.*, 703 F. Supp. 2d 362, 371 (S.D.N.Y.

2010) (citation omitted), the Individual Defendants' Motions to Dismiss Alpha's common law

fraud claims are denied.

F. **Negligent Misrepresentation Claims**

To establish a claim for negligent misrepresentation under New York law, a plaintiff

must demonstrate "(1) the existence of a special or privity-like relationship imposing a duty on

the defendant to impart correct information to the plaintiff; (2) that the information was

incorrect; and (3) reasonable reliance on the information." *Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 910 F. Supp. 2d 543, 546 (S.D.N.Y. 2012) (citing *Mandarin Trading Ltd. v. Wildenstein,* 16 N.Y.3d 173, 180 (N.Y. 2011)). A "special relationship" may arise where the person making the alleged representation holds "unique or specialized expertise," speaks from a "special position of confidence and trust," and is "aware of the use to which the information would be put and supplied it for that purpose." *Kimmell v. Schaefer,* 89 N.Y.2d 257, 263 (N.Y. 1996). In *Kimmell*, the court found that a special relationship existed when the defendant induced the plaintiffs to invest in a venture by sending plaintiffs business projections, assuring them the investment was safe, and meeting with plaintiffs personally. *Id.* at 264. In contrast, in *Ravenna v. Christie's Inc.*, no special relationship was found when a Christie's representative met and advised plaintiff on the value of a painting. The court held that a single meeting "did not even create a business relationship," let alone a relationship of "trust and confidence." 289 A.D.2d 15, 16 (1st Dep't 2001). *See also Mandarin Trading Ltd.*, 16 N.Y.3d at 180 (special relationship was not established inasmuch as plaintiff never met with defendant, and defendant never knew his appraisal would be relied upon by plaintiff).

Although Plaintiff purports to assert a claim for negligent misrepresentation against all Defendants, it only alleges that Rosen, Saglio, Goebel and Festuccia had any direct contact with Alpha or its agents that could conceivably establish a special relationship. FAC ¶¶ 31-32, 42-43, 45-46. Viewed in the most favorable light to the Plaintiff, Plaintiff's allegations support a claim for negligent misrepresentation as to Rosen and Saglio, but not as to Goebel, Festuccia or any other Defendant. Rosen, NGBF's founder and Chairman of the Board, personally met with Alpha's representative, Rabinowitz, in 2008 and again in 2010. *Id.* ¶¶ 4, 31-32. During the latter meeting, which Rosen initiated, Rosen solicited Alpha's investments in NGBF by touting the value and viability of NGBF's pending patents, justifying the Company's lackluster performance

30

history, and explaining that, although he was still running the Company, Saglio and Goebel had

been brought on to ensure its future success.  *Id.* ¶ 32.  After this 2010 meeting, Rabinowitz

followed up by conducting due diligence during telephone calls with Saglio and Goebel.  *Id.*  In

March 2011, Saglio, the Chief Financial Officer, emailed Rabinowitz a Business Plan stating that

the patent process was proceeding "with no significant issues to date."  *Id.* ¶ 42.  In May 2011,

Saglio emailed Rabinowitz again to solicit further investments and attached a finance plan

highlighting three new patent applications.  *Id.* ¶ 43.  Such allegations sufficiently plead the

existence of a privity-like relationship, and, at least with respect to Rosen's meeting in 2010 and

Saglio's emails in March and May 2011, misstatements or omissions upon which Plaintiff

reasonably relied.

Plaintiff's allegations as to Goebel and Festuccia, however, are insufficient to state a

claim.  Plaintiff fails to allege any specific statements that Goebel made during his telephone call

with Rabinowitz in 2010 and fails to allege any other basis for a privity-like relationship between

Alpha and Goebel.  *Id.* ¶ 32.  Further, as discussed above, Plaintiff cannot establish reasonable

reliance on statements made in emails that Goebel and Festuccia sent to Soares in late October

2011 because those communications were sent after Alpha made its final investment in NGBF.

*Id.* ¶¶ 45-46.  Plaintiff's claims for negligent misrepresentation are therefore dismissed with

respect to all Defendants except Rosen and Saglio.

### G.  **Breach of Fiduciary Duty Claims**

A claim for breach of fiduciary duty under New York law requires a plaintiff to

demonstrate a: "[1] breach by a fiduciary of a duty owed to plaintiff; [2] defendant's knowing

participation in the breach; and [3] damages."  *Eugenia VI Venture Holdings, Ltd. v. Glaser*, 370

F. App'x 197, 199 (2d Cir. 2010) (citation omitted).  Plaintiff alleges that, as officers, directors

and control persons, the Individual Defendants owed Alpha fiduciary duties of loyalty and care

because NGBF was both "insolvent" and operating "in the zone or vicinity of insolvency" when Alpha made its investments.  FAC ¶ 164.  Plaintiff further alleges that the Individual Defendants breached those duties by making false representations and failing to disclose material information to Alpha.  *Id.* ¶ 166.

Plaintiff offers no explanation how NGBF could simultaneously be both "insolvent" and in the "zone of insolvency."  Under New York law, corporate officers and directors owe a fiduciary duty to preserve corporate assets for the benefit of creditors once the company is actually insolvent, *Credit Agricole Indosuez v. Rossiyskiy Kredit Bank*, 94 N.Y.2d 541, 549 (N.Y. 2000); *Hughes v. BCI Int'l Holdings, Inc.,* 452 F. Supp. 2d 290, 308 (S.D.N.Y. 2006), but not while the company is merely operating in the zone of insolvency.  *See RSL Communications PLC v. Bildirici,* 649 F. Supp. 2d 184 (S.D.N.Y. 2009) (citing *Cooper v. Parsky,* No. 95 Civ. 10543 (JGK) (NRB), 1997 WL 242534, at *22 (S.D.N.Y. Jan. 8, 1997)).  *See also Alexandra Global Master Fund, Ltd. v. Ikon Office Solutions, Inc.,* No. 06 Civ. 5383 (JGK), 2007 WL 2077153, at *5 & n.3 (S.D.N.Y. July 20, 2007).  Nonetheless, Plaintiff has alleged facts to make a plausible showing that NGBF was insolvent when Alpha invested, including facts demonstrating NGBF's anemic sales in comparison with significant losses recorded from 2007-2010 and NGBF's reliance on Alpha's 2011 investments to maintain its operation as a going concern.  FAC ¶¶ 83, 89-90, 164.

Plaintiff has not, however, alleged any facts supporting an inference that Gillespie and Claiborne were NGBF directors, officers or control persons in 2011 when Alpha made its investments.  Nor has Plaintiff alleged that NGBF owed or violated any fiduciary duty to Alpha. Gillespie left the Company in March 2009, and Claiborne departed in October 2010.  *Id.* ¶¶ 7, 8. Plaintiff's claims for breach of fiduciary duty against Gillespie, Claiborne and NGBF are, therefore, dismissed.

As to the other Individual Defendants, whether Plaintiff can ultimately prove that NGBF was insolvent during the relevant period, that the Defendants their breached fiduciary duties to Alpha, and that Alpha was harmed as a result, remains to be seen.  For the time being, Alpha has alleged facts sufficient to state a claim for breach of fiduciary duty against Defendants Rosen, Goebel, Mack, Festuccia and Saglio.

H.  **Conspiracy Claims**

To establish a claim of civil conspiracy under New York law, a plaintiff must demonstrate "the underlying tort, plus the following four elements: (i) an agreement between two or more parties; (ii) an overt act in furtherance of the agreement; (iii) the parties' intentional participation in the furtherance of a plan or purpose; and, (iv) resulting damage or injury." *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 119 (S.D.N.Y. 2009).  Where the facts underlying a conspiracy claim "are the same as those underlying other claims alleged in the complaint, the conspiracy claim [shall be] dismissed as duplicative."  *Briarpatch Ltd., L.P. v. Geisler Roberdeau, Inc.*, 99 CIV. 9623, 2007 WL 1040809, at *26 (S.D.N.Y. Apr. 4, 2007), *aff'd sub nom. Briarpatch Ltd. LP v. Phoenix Pictures, Inc.*, 312 F. App'x 433 (2d Cir. 2009).  *See also Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 591 (2d Cir.2005) (plaintiff may not "reallege a tort asserted elsewhere in the complaint in the guise of a separate conspiracy claim"); *380544 Canada, Inc. v. Aspen Tech., Inc.*, 633 F. Supp. 2d 15, 36 (S.D.N.Y.2009) (dismissing civil conspiracy claim as duplicative of common law fraud claim).

Plaintiff alleges that Rosen was the "principal architect" of a conspiracy to defraud Alpha and other investors.  FAC ¶ 92.  The fraud was allegedly predicated on a February 22, 2006 Memorandum of Understanding (the "MOU") and a February 28, 2006 Exclusive License Agreement between Rosen's predecessor company, "Newco," and Petrucci, an inventor.  *Id.*  As another inventor of technology owned or licensed by NGBF, a "close ally and cohort of Rosen,"

and NGBF's Chief Technology Officer, Festuccia witnessed the MOU and later "provided cover for Rosen's deception." *Id.* ¶¶ 94, 97. The FAC contains no similar allegations as to the other Defendants who were not employed at NGBF when the MOU and the Exclusive License Agreement were executed.

Because Plaintiff makes no new allegations against Defendants Mack, Goebel, Gillespie, Claiborne, and Saglio beyond those alleged in support of its Section 10(b) and common law fraud claims to support its conspiracy claim, the Court finds that Plaintiff's conspiracy claim is duplicative of its fraud claims and therefore subject to dismissal. Plaintiff has, however, adequately pled a conspiracy claim against Defendants Rosen and Festuccia.

I.   **Aiding and Abetting Fraud Claims**

To establish liability for aiding and abetting fraud, the plaintiffs must show "(1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." *JP Morgan Chase Bank v. Winnick,* 406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005). Actual knowledge is required to impose liability on an aider and abettor theory under New York law. *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006). Although Rule 9(b) requires that the circumstances constituting fraud be stated with particularity, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). *See also Wight v. BankAmerica Corp.*, 219 F.3d 79, 91 (2d Cir. 2000) (applying a general pleading standard to plaintiff's aiding and abetting claims).

Plaintiff has alleged that in their respective capacities as Chairman of the Board, Chief Technology Officer, Chief Operations Officer, Chief Financial Officer, Chief Executive, President and Vice President of Global Sourcing, Defendants knew of the Foreign Patent Reports and knew that the deficiencies cited therein could not be cured. FAC ¶¶ 41, 47. Knowing that

NGBF's Master License Agreement was not valuable and that NGBF's pending patents were not viable, Defendants nevertheless approved statements that were either false or materially misleading regarding the value of NGBF's Master License Agreement and pending patents in order to defraud investors and enrich themselves.[24]  *Id.*  ¶¶ 24, 36, 40-41, 47.  Viewing the facts in the light most favorable to Plaintiff, the Court finds that Alpha has adequately pled the elements necessary to establish its claim for aiding and abetting fraud at the motion to dismiss stage.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.  Plaintiff's first cause of action for Section 10(b) violations is adequately pled, except with respect to Defendant Gillespie, against whom Plaintiff's 10(b) claims are DISMISSED.  Plaintiff's second cause of action for common law fraud is adequately pled. Plaintiff's third cause of action for negligent misrepresentation is DISMISSED as against all Defendants except Rosen and Saglio.  Plaintiff's fourth cause of action for Section 20(a) violations is adequately pled, except with respect to NGBG, against whom Plaintiff's 20(a) claims are DISMISSED.  Plaintiff's fifth cause of action for breach of fiduciary duty is DISMISSED as against Gillespie, Claiborne and NGBF, but otherwise is adequately pled. Plaintiff's sixth cause of action for conspiracy is DISMISSED as against all Defendants except for Rosen and Festuccia.  Plaintiff's seventh cause of action for aiding and abetting fraud is adequately pled.  Plaintiff's eighth cause of action for Section 18 violations is DISMISSED as against all Defendants.

---

[24]     Plaintiff elsewhere alleges that Defendants were merely recklessness in not knowing or disregarding the deficiencies disclosed in the Foreign Patent Reports, and in making the alleged misstatements and omissions.  FAC ¶¶ 19, 47, 92. While recklessness is clearly insufficient to establish Plaintiff's aiding and abetting claim, Defendants' allegations of actual knowledge are sufficient to withstand challenge at the motion to dismiss stage.  *Cf. Wight*, 219 F.3d at 91.

Because Plaintiff has already amended its original complaint once after Defendants'
motions to dismiss were filed, and because the Court finds that further amendment would be
futile, *In re Longtop Fin. Technologies Ltd.,* 939 F. Supp. 2d at 379, Plaintiff's request for
permission to file a second amended complaint is DENIED.   The Clerk of the Court is
respectfully directed to terminate Dkts. 32 and 36.


**SO ORDERED.**

Date:  **November 18, 2014**               **VALERIE CAPRONI**
       **New York, New York**              **United States District Judge**